PATRICK HALLIGAN, Plaintiff in Error, *v.* THOMAS J. WADE, Defendant in Error.

ERROR TO LASALLE.

An eviction in fact or in effect, which renders the premises useless, may prevent a recovery of rent.

Where an eviction is by another than the landlord, under paramount title, the rent is discharged. But an eviction of only a part of the premises, by a stranger, will authorize an apportionment of the rent; but if the eviction is by the landlord, and the tenant is kept out of possession, the whole rent will be discharged.

If a railroad company should enter into the possession of a part of the premises leased, by permission of the landlord, it would amount to an eviction of that part; although the company was not justified by taking the possession.

The renting of a reserved part of the same premises, to another, for purposes that destroy their usefulness to the tenant, upon whom the distress is levied, will amount to an eviction, whether the purposes for which they are rented, are lawful or unlawful.

THIS was a distress for rent. There was a trial by jury in the Circuit Court of LaSalle, at the February term, 1858. There was a verdict for defendant, HOLLISTER, Judge, presiding.

The evidence of the plaintiff consisted of a lease in writing by Patrick Halligan to Samuel Brown and Richard Lownsberry, of the United States Hotel and outhouses, excepting the three stores and the room occupied by the Freemasons and Sons of Temperance, for the term of five years, from October 1, 1850, at $650 a year for the first two years, and $750 each year for the last three years, payable quarterly in advance; and when the room occupied by the Freemasons and Sons of Temperance, should be given up to Brown and Lownsberry, their rent was to be increased $50 a year—making $800 a year during the last three years after this was done.

An agreement in writing between Halligan and the defendant, dated January 19th, 1853, that in settlement of all claims and demands for repairs which Wade claimed Halligan should make on the City Hotel, (the name had been changed,) Wade should retain sixty dollars from the rent then due. Wade agreed to

pay the balance of the rent on demand, Wade to have the privilege of terminating the lease, by Halligan to Brown and Lownsberry, and by them sold to Wade, in one year, by giving three months' notice. Wade to pay rent during the time he occupied, at the rate and in the manner prescribed in the lease from Halligan to Brown and Lownsberry.

*Thomas P. Halligan* testified, that Wade went into possession in the winter of 1851–2, and that he occupied till the 11th. day of September, 1853. While Wade occupied the house, the name was changed to that of the City Hotel. Wade got possession of the room occupied by the Freemasons and Sons of Temperance, in October, 1852. Wade had paid rent at $200 a quarter since then, and on the 1st day of July, there being only $15 of back rent due, the witness demanded the quarter's rent due on that day, and Wade declined to pay it, and soon after this, proceeding was instituted to collect it.

There were on the first floor four rooms. One was the office or bar-room of the hotel, and liquors were sold there at retail by Wade. The other three were stores, and occupied during the time Wade was there, for various purposes. Owen Judge occupied one for a grocery store, where a general assortment of groceries were sold, and among other things, liquor was sold there. Judge also had a bake oven out of doors, and baked bread, which was sold in the room he occupied. This establishment continued all the time that Wade occupied the premises, and was there before Wade went into possession. Another room was occupied by one Birkel, for a saloon or eating house, where oysters and other eatables were sold, also liquors, beer, cigars, etc., at retail. Birkel went into possession in February, 1853, and continued till Wade went out. In the other room below, there was in 1852 a tin shop, where tin and sheet iron ware were manufactured and sold. In 1852, Wade remonstrated with the plaintiff, the father of witness, about the noise occasioned by the manufacture of the tin and iron, and father procured another place on another lot where the articles were made, which when made were sold in the store. The manufacture of these articles was carried on in the store for about two weeks only. The business carried on in the store was as orderly as that kind of business usually is. The order in Birkel's saloon, and in the grocery of Judge, was about the same as in Wade's bar-room. The plaintiff here rested his case.

The evidence for the defendant was substantially as follows: One *Bosley* testified, that he and Caldwell bought Wade out. That Wade left in August, 1853, in the fore part of the month. Wade had assigned his lease to us. Halligan said he could not recognize the lease, but afterwards said if he could get his rent

regularly in advance, he did not care who occupied it. I think we paid the rent from the time we went in. We paid after the time we took the house, and paid no back rent, but paid rent quarterly in advance. Over the east store the front part was occupied by Wade as a family room, the back part as a reading room. Next to Wade's room was the ladies' parlor. Under this was the tin shop, used both for sale and manufacture of tin and sheet iron. The dining room was over both the west stores. The tin shop was not plastered. It was a loose ceiling. There was a bakery there. Oven on the outside of the house, immediately against the hotel. That they used a machine for pounding crackers. There was liquor sold by the glass, by Judge. In dining room could hear an ordinary conversation in the saloon below. Body of the barn a very good one. Stone barn, dirt floor, very wet, caused I think by railroad cutting off part of barn. In no condition to receive animals. Road cut off about eight feet on north-west corner, and run about half way down side. They had to put in a floor before I could use it. Kept the hotel over nine months, and went out 1st of July. Paid $200 a quarter—$600 in all. Paid on the first day of the month. Don't think we paid Wade anything for the assignment of the lease. Tin shop was there about three months in 1852, and while Wade was there. I went in immediately on Wade's going out. Wade kept a bar in the office.

*Zimri Lewis* testified, that when they were pounding iron in the tin shop, you could hardly hear in the reading room and ladies' sitting room. Has heard the noise as far as the upper story. The building and furniture were calculated for a first rate hotel. The noises in the tin shop would be a great damage to a hotel. The barn was dry and in good condition before the railroad cut off the corner; after that, it was a perfect mud hole. Birkel's grocery was a low drinking saloon. Very noisy. I was there twice when they came out late at nights, hallooing "bloody murder." It was a place where a noisy drinking crowd were in the habit of assembling. There was gambling there. The whole was a damage to the hotel. If the rent of the hotel, with the barn as good as before it was cut off, and without these disturbances, was worth $800 a year, with the disturbances and with the barn out of order, it was worth about $300. Was there when the barn was being taken off. Halligan was there assisting. Wade kept a bar in the office. I was shot in the bar-room once. The shot was through a door, and hit me in the breast. The person who shot was crazy, I suppose, from taking opium. Wade did not sell opium. I never was in Wade's when there was any shouting and hallooing. He kept a quiet, respectable bar. There was much noise and hair pull-

ing in the saloon. Wade objected to Halligan taking down the barn. Barn was cut off in 1852. Wade occupied in 1853. Halligan was there taking down the barn himself, and continued till Wade objected. He took off two double stalls west. The taking off part of the barn, let the water in on the floor. It would be better to pay $100 a month than not have the barn in connection with a hotel of that kind. I would not keep a hotel with that tin shop and grocery, and no good barn. I don't mean that the rent of the barn is worth $100 a month, but it would draw $100 a month to the house.

*John Hoffman* testified, that he had been engaged in keeping a public house in Peru. Many persons came from Wade's and stopped with me, saying they could not stay there, there was so much noise. The making of stove pipe and tin ware would injure a hotel very much. I carried on tin and sheet iron manufacture myself 11 years. It cannot be carried on as that was, without injuring a hotel. The saloons, carried on as they were, would injure the business of a hotel materially. I would not have kept the house under the circumstances Wade did, with those saloons on both sides of him. A tavern barn is about as necessary as the kitchen. It was a good barn before the corner was cut off. It was in a bad condition afterwards. The water came in very much. A barn like that was first, ought to bring $100 a month custom to the house.

*Theron D. Brewster* testified, that he was one of the directors of the Chicago and Rock Island Railroad Company, and agent for procuring the right of way; that the engineer made the lines on the barn, and then Halligan and I went and examined it, and he was to take down the barn and put it back on the line for $400; and if he did not do so by a certain day, the company were to take it down themselves. He did not do it. I directed the contractor in the employment of the company to take it down, and he did so. I paid the $400 and took a receipt. The conversation with Halligan, and the taking down the barn, was in the spring of 1853. The lot was not assessed to my knowledge. There may have been conversation about the assessment, but I do not recollect it.

The plaintiff then introduced *Thomas Halligan*, who testified that the barn was situated on lot six, in block sixteen, in the town of Peru, and then introduced the following petition, order of the judge and award, which, so far as relates to that lot, are set out at length in the record.

The petition, signed by the attorneys of the road and addressed to the judge of the Circuit Court, sets forth that the following described town lots are required for the right of way, to wit:

No. 128. Also that portion of lot twelve in block sixteen, in the town of Peru, (here follows the description,) belonging to George B. Willis.

No. 138. Also that portion of lot six, in block sixteen, in the town of Peru, lying north of a line drawn from a point on the west line of said lot, eighteen feet from the north-west corner, to a point on the east line of said lot, three feet from the north-east corner, belonging to Patrick Halligan.

Pursuant to the prayer of the petition, on the 15th of December, 1852, and it appearing that due notice had been given, commissioners were appointed, by an order of the judge, to fix the compensation and assess the damages to be paid to the parties interested, for the right of way, for the town lots and parts of town lots in the said petition mentioned and particularly described.

The award of the commissioners awards to Patrick Halligan for all that part of lot six, in block sixteen, in the town of Peru, described in said petition and numbered on the margin thereof 138, the sum of four hundred dollars for the right of way and materials for the construction of said road.

It is certified in the award that sundry persons, and among them Halligan, appeared before the commissioners.

The plaintiff requested the court to give the following instructions in writing:

1st. That although the plaintiff, Halligan, may, during the time that the hotel was occupied by the defendant, Wade, and before the quarter's rent, due July 1st, 1853, become due, have rented the three stores under said hotel, and in the same building, to other tenants, and although one of said stores may have been used by the occupant, as a place for the making and selling of bread and groceries, also for the sale of liquor, by retail, and another of said stores may have been used as a saloon, in which oysters, and other eatables, and liquor by retail, were sold, and another of said stores may have been used as a place of business, for the manufacture and sale of tin ware and stoves; and although said business, though carried on properly, or by reason of its being carried on in an improper and disorderly manner, by said other tenants, may have operated to annoy and disturb said Wade, in the occupation of the hotel, yet, if the said Wade continued to occupy said hotel, until the said quarter's rent became due, and was occupying the same when said rent became due, such annoyance and disturbance would not excuse the said Wade from his liability to pay said quarter's rent, nor would he be entitled to any deduction.

2nd. If, after the said hotel and appurtenances were let by said Halligan to said Wade, and before said quarter's rent, due

July 1, 1853, became due, the Chicago and Rock Island Railroad Company caused the said Halligan's damages to be assessed therefor, and afterwards, in order to make a track for said road, took down a portion of the barn, on said leased premises, said railroad company did not thereby acquire the right of way as to said Wade, and said railroad company is liable to said Wade, for the injury done him, unless his damages have been assessed and paid by said railroad company—and the fact that said railroad company, under such circumstances, took down a part of said barn, though with Halligan's consent, is no reason why said Wade should not pay said quarter's rent to said Halligan; and if the disturbances of said Wade, in his said possession of said leased premises, were only those mentioned in the first and second instructions above, the jury should allow the quarter's rent, due July 1st, 1853.

3rd. If the jury allow said quarter's rent, they should also allow interest at the rate of six per cent. per annum thereon, from the first day of July, A. D. 1853, till the present time.

4th. Even though the Chicago and Rock Island Railroad Company may, for the purpose of making a track for their road, have taken down a part of the barn on the leased premises, this alone would not entitle the defendant to a deduction on his rent —nor would he be entitled to such deduction, if the railroad company, claiming and having the right to make a track for their road, did make it, and Halligan, knowing they were making it, acquiesced in its being made, or at the request of the railroad company, assisted in taking down and removing a portion of the barn.

5th. If the business in the stores, under the hotel, was a business which might be lawfully carried on in them, and the defendant did not leave the premises rented to him, but actually remained in possession of them, till the rent became due, then, although he may have been disturbed by said business, the jury should make no deduction from his rent, on account of such disturbance—and the jury are instructed, that the business transacted in said stores, was not unlawful in its character.

6th. If, after the disturbances mentioned in the 1st and 2nd instructions, the defendant, Wade, continued to remain in the possession of the leased premises, and after said disturbances occurred, paid rent for said premises, he would not, by reason of said disturbances, be entitled to a deduction on his rent.

7th. Although the jury may believe, from the evidence, that the defendant, Wade, may have assigned his lease to Bosley, and left the premises before the quarter, commencing on the first day of July, A. D. 1853, had ended, he should not, for this

reason alone, be excused from the payment of any portion of the rent for the full quarter.

8th. If the defendant, Wade, instead of surrendering the possession of said premises to Halligan, after the disturbances in the first and second instructions mentioned, without the consent of Halligan, sold or gave his interest in the lease, to Bosley, and let Bosley into possession of the premises under him, he is not entitled, in law, by reason of said disturbances, to any deduction on the rent, which had before that time become due from him to Halligan.

9th. The fact that Halligan leased premises of his own, other than those occupied by the defendant, to other tenants, who carried on a business which was lawful, although such lawful business may have annoyed and disturbed the defendant, Wade, in the quiet enjoyment of his premises, would not excuse Wade from the payment of any portion of his rent, unless Halligan intended, when he leased such other premises, to disturb Wade, or unless the business, if properly conducted, would necessarily disturb Wade, nor even then, unless the disturbance rendered the premises occupied by Wade wholly valueless.

10th. If the jury believe, from the evidence, that in order to make a track or way for the railroad of the Chicago and Rock Island Railroad Company, it was required that a portion of the barn should be taken down, and if, in 1852, and after the tenancy under the lease commenced, the damages occasioned thereby to Halligan were appraised by commissioners appointed by the judge of the Circuit Court, at four hundred dollars, and if, in 1853, it was agreed between Brewster, acting for said company, and Halligan that Halligan should, in consideration of four hundred dollars, take down the portion of the barn necessary, himself, and if Halligan commenced to take down the stalls in the barn, and at the request of Wade, desisted, and put back the stalls, and the company afterwards took down part of the barn, without objection on the part of Halligan, and against the consent of Wade, these facts would not entitle the defendant to any deduction on his rent.

11th. If, under the petition and award, $400 were awarded to Halligan, for the right of way, and this sum was afterwards paid to Halligan, and accepted by him, this would entitle the Rock Island Railroad Company to the right of way across the Halligan lot, as to him, and a taking of the part of the lot under these circumstances, by the company, for their road, though Halligan did not object to the taking, would not excuse Wade from the payment of rent.

The court refused to give the first and eleventh instructions, and modified the second, so as to make it read as follows:

Halligan *v.* Wade.

2nd. "If, after the said hotel and appurtenances were let by said Halligan to said Wade, and before said quarter's rent, due July 1st, 1853, became due, the Chicago and Rock Island Railroad Company caused the said Halligan's damages to be assessed therefor, and afterwards, in order to make a track for the said road, took down a portion of the barn, on said leased premises, said railroad company did not thereby acquire the right of way, as to said Wade, and said railroad company is liable to said Wade, for the injury done him, unless his damages have been assessed and paid by said railroad company—and the fact that said company, under such circumstances, took down a part of said barn, is no reason why said Wade should not pay said quarter's rent to said Halligan—and if the disturbances of the said Wade, in his said possession of said leased premises, were only those mentioned in this instruction, the jury should allow the quarter's rent, due July 1st, 1853."

Gave the fourth instruction as asked, and modified the fifth by adding at the end of it, these words : " This is the law, unless the jury believe that such disturbance destroyed the beneficial enjoyment of the leased premises."

Modified the sixth, so as to make it read as follows :

6th. "If, after the disturbances mentioned in the second instruction, the defendant, Wade, continued to remain in the possession of the leased premises, and after said disturbances occurred, paid rent for said premises, he would not by reason of said disturbances, be entitled to a deduction on his rent."

Gave the seventh—modified the eighth, by erasing the word " first," and changing the word " instructions " to " instruction " —modified the ninth by striking out the words " rendered the premises occupied by Wade, wholly valueless," and inserting in lieu thereof, the words " destroyed the beneficial use by Wade, of the premises "—modified the tenth, by striking out the words " objection on the part," and inserting in lieu thereof, the words " the consent," and refused the eleventh.

The defendant requested the court to instruct the jury, as follows :

1st. If Halligan rented the premises in question, to Wade, under the leases read in evidence, and if, after Wade took possession of them, under such renting, Halligan sold a substantial and valuable portion of said premises to the railroad company, and put said company in the actual possession thereof, thereby turning Wade out of possession of that portion of the premises, and if said company has ever since held the actual, exclusive possession thereof, under said sale, then Halligan has no right to recover rent for any portion of the premises so rented to Wade,

from the time that Wade was so turned out of possession of a portion of the same.

2nd. The proceedings offered in evidence, do not show any legal condemnation of any portion of lot six (6), in block sixteen (16), in Peru, for railroad purposes, and the railroad company acquired no right to take possession of the land in question, or any portion thereof, by virtue of such proceedings.

3rd. If the jury believe, from the evidence, that Halligan rented a hotel to Wade, and afterwards rented the rooms under said hotel for such purposes, that Wade was necessarily disturbed in his quiet and peaceable possession of said premises, by the business carried on in said stores, with the consent of the plaintiff, then the jury should deduct from the rent of said premises, the amount that the rent was worth less, by reason of such disturbance.

4th. Under the lease which has been given in evidence, the law will imply covenants against such acts of the landlord as destroy the beneficial enjoyment of the lease, and if, after Wade took possession of the premises in question, under such lease, Halligan did do acts that destroyed the beneficial enjoyment, he cannot recover of Wade, the rent for the premises, for the time Wade was so disturbed.

5th. If the premises were leased by Halligan to Wade, to be used as a hotel, and if, after such leasing, Halligan did such acts as destroyed the beneficial enjoyment, by Wade, of said premises, for the purposes for which they were leased, Halligan thereby forfeited his right to collect rent of Wade, for the time Wade was so disturbed in the enjoyment of the premises.

6th. If Halligan rented the premises in question to Wade, to be kept as a hotel, and afterwards rented the stores under said hotel, to be used in business, which, if carried on, as it lawfully might be, and as such business ordinarily was conducted in that place, would necessarily destroy the beneficial use of said premises, by Wade, and said business was carried on in the ordinary way of doing such business, and did thereby deprive Wade of the beneficial use of said premises as a hotel, then Halligan cannot recover rent for said premises, during such disturbance.

The court refused the third, and gave all the others.

The jury found for the defendant; the plaintiff moved for a new trial; the court overruled the motion, and plaintiff excepted.

The errors assigned, are:

1st. The court erred in giving defendant's instructions, and each of them.

2nd. The court erred in refusing plaintiff's instructions, and each of them, and in qualifying them, and each of them.

Halligan *v.* Wade.

3rd. The verdict and judgment were against the law and evidence.

4th. The court erred in overruling motion for new trial.

LELAND & LELAND, for Plaintiff in Error.

GLOVER & COOK, for Defendant in Error.

WALKER, J. When this case was before this court on a former trial, it was laid down as a general and well settled rule, " that an eviction, in fact or in effect, which destroys and renders the premises useless, may be set up in defense against a recovery of rent; and this extends to such acts of disturbance as effect the same thing." The first instruction asked by plaintiff was based upon the supposition that even if it was true that an eviction of a portion of the premises, and such other acts had been done by plaintiff as had the effect of an eviction of the whole, nevertheless if defendant was in the possession of the demised premises when the rent became due, he would be liable for its payment. In this case it appears from the evidence that the rent was due quarterly, and payable in advance. The demand was made, and this proceeding instituted for the recovery of a quarter's advance rent, which was payable by the terms of the lease, on the first of July, 1853, and this proceeding was instituted within that month. The plaintiff received about half of the rent for this quarter, of Caldwell, who succeeded the defendant in the possession of the premises, and there can be no question that defendant was entitled to a deduction to the extent of this payment. Plaintiff could have no right to collect the same rent from defendant, and also from Caldwell. This instruction was calculated to mislead the jury, and was therefore properly refused.

An eviction may be occasioned either by the landlord himself, by entering without title, or by a third person under paramount title. When the eviction is of the whole of the demised premises, under paramount title, such eviction has the effect to discharge the rent. But an eviction of only a part of the premises, if by a stranger, the rent will be apportioned, but if by the landlord himself and the tenant is kept out of possession of that part, the whole rent will be discharged. 3 Kent, 464; 1 Saund. R. 204, note 2; 1 Ld. Ray. 370. The evidence shows that plaintiff sold a portion of the demised premises to the railroad company, and by his permission, agreement and consent, the road entered into the possession of that portion before this rent became due by the terms of the lease, and they deprived defendant of its use and occupancy. Now if this

were true, the plaintiff was not entitled to recover, as his first instruction asserted.   The modification to his second instruction presented the law as it was applicable to the evidence, and it embraced the legal proposition contained in the eleventh, and presented it as clearly and fully as amended in the eleventh, and no error is perceived in substituting that which was given for the second, nor in refusing the eleventh.

There was no evidence that the assessment of damages was ever approved by the Circuit Court, and if this had been done, that would only operate upon the right of Halligan, and Wade would still have a right to compensation for the injury to his right of possession under the lease.   And until his damages were assessed and paid, the railroad could not enter upon the premises, nor could the landlord put them into possession without evicting his tenant of that portion of the demised premises. Nor would the consent and authority of the landlord that the road might, enter into the premises, justify them in taking possession, and if it was taken in consequence of the landlord's authority and consent, he would be responsible for the act, and it would operate as an eviction of that portion.   The arrangement between the road and plaintiff only passed the title of plaintiff, subject to the lease to defendant, and until the right of defendant was extinguished, or he consented to the entry it was unwarranted by the law.

If plaintiff by depriving defendant of this portion of the demised premises, and by leasing the reserved portions, for purposes, that rendered them useless for the business for which defendant rented them, he would be thereby discharged from paying rent.   And the evidence tended strongly to show that such was the case, and this was a fact for the finding of a jury, and justified the giving the instructions announcing that principle.   It was insisted on the argument that a distinction existed between leasing the reserved portions of the premises for lawful or unlawful purposes.   And that as these leases were made for the purposes of carrying on lawful pursuits, the law gave defendant no right to complain.   But it is believed that such a distinction does not exist.   Suppose in this case the landlord had converted the rooms under this hotel into pig stys and horse and cattle stables, can any one doubt that such an act would have been equally destructive to the business of the tenant as would almost any species of unlawful business that could be tolerated in any city, and yet they would be appropriated to lawful purposes.   And it may be and doubtless was equally destructive to the business of keeping a hotel, that those rooms were appropriated to the keeping of a low, noisy, and disorderly liquor saloon, and a tin shop.   We think the evi-

dence justified the jury in finding that there was such an eviction, or what had the effect of such an eviction as released the defendant from the payment of this rent. No objection is perceived either to the giving, refusing, or modifying the instructions asked by either party, and from a careful examination of the record we think the evidence justified the verdict.

The judgment of the court below must be affirmed.

*Judgment affirmed.*