Jacob L. Kesner, Appellant, v. Consumers Company, Appellee.

Gen. No. 32,540.

Opinion filed December 31, 1929.

MAYER, MEYER, AUSTRIAN & PLATT, for appellant.

WINSTON, STRAWN & SHAW, for appellee; EDWARD W. EVERETT and GEORGE. T. EVANS, of counsel.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This is an action to recover rent after August 1, 1917, under leases from plaintiff Kesner to defendant company running to 1933, and covering the 20th and 21st floors and additional rooms of the Consumers Building at the Northwest corner of South State and Quincy Streets, Chicago. Defendant paid the rent to August 1, 1917, and vacated the premises July 27, 1917, under a claim of constructive eviction. Under the pleadings and stipulations the case went to trial upon that as the controlling issue and resulted in a verdict and judgment for defendant. This appeal followed.

A former trial resulted in a judgment for plaintiff for $73,962.34. The judgment was reversed by this court and the cause remanded for a new trial (239 Ill. App. 92), for errors in giving and refusing instructions and in the admission of evidence. So far as the case was tried in conformity with the views there expressed, we are, of course, bound by them.

The evidence is voluminous. The points raised are discussed at great length. But as we view the record, the main question is: Did the leasing by plaintiff of other parts of the building to film exchange companies and, in view of the character of their business, permitting them to conduct the same therein—especially after the fire hereinafter referred to—operate to deprive defendant of the beneficial use or enjoyment of the demised premises so as to justify its vacating the same? We shall recite the facts that seem pertinent to that question.

After the execution of the leases to defendant, plaintiff executed leases to film exchange companies for

space on the 4th, 14th, 15th, 18th and 19th floors of said building "for office, sales and work room or motion picture film exchange." Substantially all of the 19th floor and the entire 15th and 18th floors were used for such purposes. Two exchanges, the Pathé and another, occupied space on the 4th floor.

On July 1, 1917, about 3 a. m., when few, if any others than employees of such exchanges were in the building, a fire broke out in the vaults of the Pathé exchange containing films, and was accompanied by a series of explosions. The fire was described as of a fierce character, a "roaring furnace," the flames shooting out like a blow torch from the vault window across a 12-foot alley where they set fire to another building, and also across Quincy Street, breaking windows on its south side. It heated the fire escape to a white heat, warping it and the standpipe attached thereto and melted off the hose connections to the 4th and 5th floors on the outside standpipe and also glass in the windows of one of defendant's rooms on the 5th floor immediately above the Pathé vaults. The film vaults were wrecked. Poisonous gases were emitted and one man overcome by them.

It is unnecessary to elaborate upon other effects of this particular fire. The important and controlling facts for consideration, in our opinion, are the inherent danger of fire from the ignitible nature and explosive ingredients of films and the poisonous and highly dangerous gases they give off when burning or decomposing. These facts bear directly on the main question above stated.

While the precise cause of the fire was not ascertained, several experts testified to the highly ignitible and combustible character of the films and to the dangers of fire and the hazards arising from handling and storing them, particularly from explosions and the evolving of toxic gases. A film is a thin strip of cellu-

lose coated with photographic emulsion. It is less than 2 inches wide and from 10 to 25 one-thousandths of an inch thick. A reel of film contains 1,000 feet and weighs 5 pounds. At times the vaults of these exchanges contained many tons of these films, which in the course of their business were carried back and forth from their rooms to exhibition places.

Testifying to their characteristics and the attendant dangers of handling them and stating them in the order of their importance, plaintiff's own and only expert described them as follows: Ease of ignition; combustibility; rapidity of burning; ease of transmission of fire; difficulty in extinguishing when thoroughly burning; the possibility of explosions of gas mixtures. He stated that an open flame or spark may be supplied by the most "trivial circumstances,"—a match that may be carelessly dropped or trod upon, a broken electric light globe, a short-circuited electric wire, unprotected steam pipes, a lit cigar or cigarette, and the like.

It appeared from the testimony of one of plaintiff's witnesses that in the course of conducting the film exchange business, which required bringing in, storing and taking out films by their employees, there was much confusion during the rush hours between 11 p. m. and 3 a. m., and that often cans of film were then strewn around the floor, reels of film exposed, vaults left open, reels "slammed" into them and piled around on shelves or on the counter without can or metal containers, and that smoking at night in the rooms was a common practice. Some of these acts would be deemed negligence and some were in violation of the ordinance, with which, as we say later, plaintiff would be chargeable.

There was no substantial dispute as to the dangers and hazards attending the handling and storing of such films, or of plaintiff's actual or at least constructive knowledge of them. It was shown that to a certain point a film has the same ingredients as gunpowder and

other explosives, that it ignites at a comparatively low temperature and more easily than any common substance except gunpowder and like explosives, that it burns with extreme rapidity and does not require air to burn because the substance itself has sufficient oxygen, that when thoroughly burning there is no means of extinguishing the fire, that water will not do it, that it will burn 10 to 15 times faster than paper in similar form, that the heat so generated is so intense that it will pass through a brick wall and start the decomposition of films on the other side of it, that a film will decompose without flame and in an air-tight compartment and also under water, that the gases therefrom may cause explosions or disruption from pressure, that decomposing in a vault creates pressure which may be sufficient to blow out its walls and to force gases out into the room where mixing with oxygen they may burst into flame, that when burning, a film gives off highly toxic gases, carbon monoxide and carbon dioxide, that breathing air containing a small percentage of carbon monoxide is often fatal to the human system, sometimes in a few minutes, that one-hundredth of one per cent mixed with air would be fatal in five minutes, that these gases will go through any aperture or opening, through the crevices around doors, and in case of fire (there were grilled doors to elevators and open stairways in the building) would under pressure of heat therefrom permeate all open space above to the highest floor of the building, and might be released in sufficient quantities to cause death to occupants of the higher floors.

While plaintiff offered evidence tending somewhat to minimize the extent and imminence of these dangers, yet their inherent nature and the necessity for extreme precautions for safety, whether in transporting, handling or storing films in large numbers or quantities, must be recognized as indisputable facts.

It was undoubtedly with reference to these danger-ous characteristics that the ordinance of the City of Chicago creating the Bureau of Fire Prevention and Public Safety provided many requirements intended to guard against the inherent dangers of the business of storing and handling films, and recognized it might be a nuisance. It required the chief to make an investi-gation "for the purpose of ascertaining whether or not the building or place at which it is desired or intended to store or use motion picture films is so situated that the storing or using of motion picture films therein would not be so dangerous as to constitute a nuisance, or to be a menace to the safety of the public or to the adjoining property, and also whether the conditions under which such motion picture films are to be checked or used, are such as to provide the maximum of safe-ty."

It provided, among other things, that the films be kept in individual tin cans, metal or galvanized boxes with tight fitting covers and when not in use be stored in fireproof vaults, that only 20 films be exposed when being inspected or examined, and not exceeding 5 be kept or stored in a room where there was a projecting machine; that the walls of the vaults (in a fireproof building) be of brick not less than 8 inches thick, or hollow tile not less than 12 inches thick, laid in cement, the top and bottom to be waterproof and made of brick, tile or concrete 8 inches thick, that the vaults be venti-lated to the outside air by an open area of at least 50 square inches, and the repairing room have outside ventilation and be separated from the rest of the build-ing by tight partitions of noncombustible material. There was evidence tending to show that some of these provisions also were violated, and that plaintiff knew or was charged with knowledge of some of such viola-tions.

The briefs in this case discuss at great length the doctrine of constructive eviction and cite many author-

ities, ancient and modern, bearing upon nearly every phase of the doctrine. It would require too much space to discuss the cited cases and note their distinguishing features. In the view we take of this case it is not necessary so to do nor to recite in detail the evidence bearing upon specific violations of the ordinance. We are disposed to base our opinion mainly upon the view that the facts support the conclusion that permitting the conduct of a business which subjected plaintiff's other tenants to such inherent dangers constituted a nuisance which it was the duty of plaintiff to abate, and that his failure, or what was his refusal, in practical effect, to do so, violated the covenant implied in every lease for quiet enjoyment (16 R. C. L. 763, sec. 259; *Russell v. Clark,* 173 Ill. App. 461) and constituted a constructive eviction.

Whatever differences of view may be advanced respecting the landlord's duty before the fire we think there is no room for any difference of opinion as to his duty when the fire and the investigation as to its causes had unquestionably revealed to him and his tenants knowledge of the inherent dangers attendant on the conduct of the business of storing and handling films. Not until then had defendant become apprised of the dangerous situation to which its employees and property were subjected by the conduct of such business. Had defendant known of these dangers before that time it would hardly have been willing to expose its force of about 300 employees, one-fourth women, occupying floors above the exchanges, to the sleeping dangers of death from fire or toxic gases. Accordingly, immediately after the fire, defendant's president notified plaintiff that unless the film exchanges were removed from the building defendant would vacate its rooms. Plaintiff thought him too easily "scared" and said he could not terminate their leases but suggested that he might give defendant space on floors below those occupied by the film exchanges. While defend-

ant's president indicated a willingness to make such a change if satisfactory space could be furnished, after conferences and correspondence on the subject he deemed the offered space unsatisfactory for defendant's needs and conveniences, and on July 21, notified plaintiff by letter of defendant's election to cancel the leases and vacate its rooms on or before midnight of July 31, up to which time it had paid rent, basing its action on the untenantability of the rooms because its property and the lives of its employees were rendered unsafe by such film exchanges.

Without detailing more particularly these negotiations, we find nothing in them, as urged by plaintiff, that operated as an estoppel or that justifies the claim of bad faith on the part of defendant in conducting them. If the facts and circumstances justify the conclusion of a constructive eviction defendant had a reasonable time within which to vacate the premises (*Giddings v. Williams,* 336 Ill. 482), and the time taken under the circumstances was not unreasonable. It was for defendant to say whether or not the space offered below the floors occupied by the film exchanges was adequate to its needs, and the negotiations with regard thereto had no legitimate bearing on the sole question here involved, whether the housing of such a dangerous business beneath defendant's rooms was a breach of the covenant for peace and quiet enjoyment.

Nuisances were classified by our Supreme Court in *Laugel v. City of Bushnell,* 197 Ill. 20, as "*first,* those which in their nature are nuisances *per se,* or are so denounced by the common law or by statute; *second,* those which in their nature are not nuisances but may become so by reason of their locality, surroundings or the manner in which they may be conducted, managed, etc.; *third,* those which in their nature may be nuisances, but as to which there may be honest differences of opinion in impartial minds." While perhaps the

business itself of storing and handling films may not come within the first classification, it may easily fit under either of the other two classifications. If it was not in its nature a nuisance it may well be said to have become so when conducted in such surroundings and in such a manner as to imperil the property and lives of others. And if there may be an honest difference of opinion respecting whether it may have been regarded as a nuisance in its nature prior to the fire, we think no impartial mind would be in doubt on the subject after the fire.

One of the definitions of a private nuisance is "any condition created by one which causes another reasonably to be constantly apprehensive of injury to his life or property." *Zeppenfeld v. Franklin Motor Service Co.* (Ind.), 134 N. E. 487. In *Henderson v. Sullivan,* 159 Fed. 46, it was defined as "anything which annoys and disturbs one in the possession of his property, rendering its ordinary use and occupation physically uncomfortable to him."

It would seem that after the fire defendant might well have been apprehensive of future fires, explosions and deadly gases with possible fatal consequences, no matter what precautionary measures for safety might be taken. The very fact that the fire in question took place from an unascertained cause while the several film exchanges were being conducted under what plaintiff claims was a general compliance with ordinance restrictions and provisions, might well justify such fear and the apprehension of another fire with more disastrous consequences. In *Laflin & Rand Powder Co. v. Tearney,* 131 Ill. 322, in an action to recover damages resulting from an explosion of gunpowder on property adjacent to plaintiff's dwelling house, the court said that the explosive was so situated with reference thereto "that it was liable to inflict serious injury upon her person or property in case of an explosion,"

and that the keeping of the explosive "considered with reference to 'the locality, the quantity and the surrounding circumstances,' constituted a nuisance *per se.*" While that was not a case of landlord and tenant the views of the court thus expressed are none the less applicable to the analogous condition of dangers to a landlord's tenants from explosions and gases incident to the business of storing and handling films which he permits to be conducted on the premises.

In this connection it is well to note that the very nature of the business is such that the ordinance contemplated that it might constitute a nuisance. Another section of the ordinance declared that "any building, . . . or premises perilous to life or property by reason of the nature, condition or quantity of its contents or its use . . . is hereby declared to be a nuisance, and in such a case directs the Chief of Fire Prevention and Public Safety to cause its abatement." The recognized fact that the nature of the business is such that it may nevertheless be or become a nuisance and render the premises such, seemingly would cast upon the landlord a duty to investigate and know whether conditions in his building were such as would deprive his tenants of the beneficial use and enjoyment of their leaseholds and require abatement. That plaintiff was chargeable with knowledge of the provisions of the ordinance and of the dangers to be averted is not open to question. His leases to the film exchanges required him to do structural work for housing the exchanges and contemplated that the same should be in conformity with the ordinances, and the work was done under his direction or superintendence, and in some respects was not in conformity with the ordinance provisions. In our former opinion we said and again repeat that the duty to comply with the ordinances was upon the owner of the building as well as upon the tenants and that plaintiff had the power under his leases to the film ex-

changes to compel observance by them of all city ordinances.

That the business was lawful and might be licensed does not affect the question. As said in *Halligan v. Wade,* 21 Ill. 470: "There are lawful trades which are nevertheless treated as nuisances in particular places and localities." As recognized in *Barnard Realty Co. v. Benwit,* 139 N. Y. S. 1050, we think the changed conditions incident to modern buildings require elasticity in the application of the doctrine of constructive eviction. The storage and handling of films in large quantities is comparatively a recent business and the dangers attending it have only lately become generally known. These dangers are particularly menacing to occupants of our modern high structures like that in question where escape may be impossible. Even while this case has been under consideration the whole country has been apprised through the press of a sudden and disastrous fire resulting, as alleged, from gases generated from films stored in a hospital in the City of Cleveland, Ohio, that was accompanied by loss of life to many of its inmates. We do not pretend to take judicial notice of the direct causes thereof, but the generally accepted accounts that the fire emanated from stored films and spread so suddenly as to foreclose escape of many of the inmates of the building may at least be referred to as justifying apprehension and fear on the part of those who incur the dangers attending the storage of films. And even while we write this observation is emphasized by reports of another fire in a film studio in New York in which ten persons lost their lives and others were severely burned. No one would question defendant's right to vacate the premises had plaintiff leased space beneath the floor occupied by it for storing other forms of explosives, even under regulatory provisions, yet the films, according to the testimony, possessed characteristics that made

them equally dangerous and unsafe to tenants of the building occupying floors above where they were stored.

The general principles underlying the doctrine of constructive eviction are too well established and understood to call for special discussion. As is frequently the case, the difficulty is in the application of settled principles to an unusual or novel state of facts. Reviewing the authorities cited by appellant we are impressed that in the discussion of them appellant has stressed points and conditions therein that are not applicable to the distinguishing features of the case at bar.

While no case of constructive eviction based upon a state of facts similar to those at bar has been called to our attention, yet we think that under the facts and circumstances disclosed in this case the conducting of these film exchanges, storing and handling many tons of films in a building where others were subjected to the imminent dangers therefrom of fire, explosions and toxic gases, rendered the business a nuisance which plaintiff was bound to abate, and that upon his failure to do so defendant was justified in vacating the premises and released from further payment of rent.

Appellant has devoted some 50 pages of its brief to an extensive and technical discussion of numerous instructions given and refused. It would extend this opinion beyond reasonable limits to take up each one of the various points discussed. We have already expressed views which should obviate the necessity of rehearsing many of the points made. Suffice it to say if our views are correct we find nothing sufficiently misleading or erroneous in the instructions given when taken as a whole, or in the action of the court in refusing plaintiff's instructions, that calls for a reversal of the judgment.

In view of the conclusion reached we would not, but for alleged errors in the giving or refusing of instruc-

tions relating to the charge of negligence on the part of plaintiff to see to it that the provisions of the ordinance were complied with, discuss more particularly that subject. As before stated, there was evidence tending to show negligence in that respect by the film exchanges and also knowledge thereof, actual or constructive, on the part of plaintiff. We shall not review the numerous details relating to that subject. If the business constituted a nuisance then negligence was not a necessary element to the defense. (20 R. C. L. 381, sec. 3.) There was a basis for the instructions on the subject, however, in plaintiff's neglect of duty as aforesaid.

In this connection plaintiff invokes the rule that the landlord cannot be held liable for the negligent conduct of a business by one of his tenants whereby another tenant suffers injury unless he actively participates therein. As before stated, and as held in our prior decision, under the ordinances and the facts of the case the duty rested upon plaintiff as owner of the premises, regardless of the technical relationship of landlord and tenant, to see that the ordinances were complied with. He was, therefore, directly chargeable with any omission of his duty in that respect, and in view of the nature of the business permitted by him to be conducted by his tenants and his said duty, could not shift his responsibility on them. For that reason we do not think there was any room in this case for the application of the doctrine invoked. It is incompatible with the facts of the case and the theories upon which it was tried.

The judgment is affirmed.

*Affirmed.*

SCANLAN and GRIDLEY, JJ., concur.