JOHN MUNIC MEAT CO., INC., Plaintiff-Appellee, *v.* H. GARTENBERG & CO., Defendant.—(MELVIN GARTENBERG *et al.*, Defendants-Appellants.)

First District (5th Division)    No. 76-263

Opinion filed July 29, 1977.

Joel J. Bellows and Charles B. Bernstein, both of Bellows & Associates, of Chicago, for appellants.

Robert J. Krull, of Spitzer, Addis, Susman & Roskin, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from a judgment granting plaintiff damages in the amount of $46,320 against defendants Melvin Gartenberg and Robert Gartenberg for failure to comply with lease covenants and denying defendants' counterclaim for damages because of alleged lease violations. H. Gartenberg & Co., also named as a defendant, was dismissed by stipulation.

The briefs and arguments center on the following principal issues: (1) whether plaintiff established it was constructively evicted; (2) if so, whether the damages awarded were excessive; and (3) whether defendants' counterclaim for damages was improperly denied.

Plaintiff was a meat packing company and, as such, was subject to the

rules and regulations of the United States Department of Agriculture—Meat Inspection Division (MID), which require the building in which the meat packer is doing business to obtain a MID number. When MID issues such a number, it provides meat inspection services—not only for the meat plant but for the entire building. If a MID number is withdrawn, whether because of deficiencies in the operation of the meat plant or the condition of some other portion of the building, the packing company is not allowed to continue doing business until the MID number is reinstated—and that will not occur until the government is satisfied that its standards are met. Where there is a withdrawal, the MID number is kept open for one year and, if the owner of the building has not then brought it up to MID standards, the number is reassigned to someone else.

It appears in the instant case that in December 1967 plaintiff leased the second floor of defendants' building to operate its meat packing business. The lease provided that defendants had obtained MID number 2500 for the building and that defendants were to comply with the requirements of MID for the retention of that number in all areas of the building, except that the requirements relative to the demised premises were to be performed by plaintiff. The second floor was occupied by plaintiff in January of 1968, and it continued its business there until February 1972, when an event occurred which will be more fully discussed. In 1969, another meat packer, Opal Meat Company (Opal), leased and took occupancy of the entire first floor.

During the course of the ensuing months, any deficiencies found by MID were corrected by either plaintiff or defendants—or perhaps Opal if they occurred on its premises. Then, the parties received a letter from MID (hereafter the MID letter), dated February 14, 1972, informing them that the MID number was conditionally withdrawn because of certain deficiencies and substandard conditions which were uncorrected. This MID letter stated that from August 8, 1971, numerous unsatisfactory conditions and plant deficiencies required withholding of inspection on several occasions; that "33 other times facilities and/or equipment were rejected until such were made clean"; that during the six months prior to the letter there were 33 instances of inspection services being withheld for one or more hours; and that on February 2, 1972, Inspector Bonkowski found 11 unsatisfactory conditions. The letter went on to state that on February 10, 1972, Inspectors Crawford and Bonkowski "noted the following additional deficiencies that would need to be corrected if inspection is to continue * * *." This quote was followed by a listing of 21 deficiencies. It was then stated in the letter that "the conditional withdrawal will remain in effect pending correction of the above deficiencies."

After the MID letter was received, plaintiff vacated the building on

February 16 or 18, 1972. It occupied new premises the same day and resumed its packing operations at that new address on February 22 or 24. There was testimony by its president that plaintiff left the old premises with the intent to return when the inspection services were reinstated, and that it offered to share the expense of repair by placing money in escrow but that the offer was declined. Eventually, in the third week of April, 1972, plaintiff signed a lease for the new premises at a rental of approximately $3,400 a month, beginning March 1, 1972, and extending for a period of 10 years.

Three persons testified at the trial, and their testimony will be discussed where necessary hereafter in this opinion. Following the trial, the court found for plaintiff on its complaint and against defendants on their counterclaim. This appeal is brought from that order.

OPINION

In their briefs, defendants first assert that the court erred "in failing to apply the terms of the lease which govern the specific controversy and in failing to recognize the failure of plaintiff-lessee to comply therewith." They then recite certain terms of the lease which they allege were breached by plaintiff. These alleged violations hinge upon and will be discussed in connection with the crucial question of whether the record supports the court's finding that plaintiff was constructively evicted.

■ ■ Constructive eviction has been defined as "something of a grave and permanent character done by the landlord with the intention of depriving the tenant of the enjoyment of the premises" (*Gillette v. Anderson* (1972), 4 Ill. App. 3d 838, 282 N.E.2d 149) and, as a general rule, there can be no constructive eviction unless the tenant surrenders possession or abandons the premises (*Gillette*). Where premises leased are rendered useless to the tenant or the tenant is deprived, in whole or in part, of the possession and enjoyment thereof as the result of the wrongful act of the landlord, there is a constructive eviction (*A.H. Woods Theatre v. North American Union* (1927), 246 Ill. App. 521; 24 Ill. L. & Prac. *Landlord and Tenant* §334 (1956)), and it may result from the landlord's failure or refusal to perform the covenants and conditions of the lease (*Kesner v. Consumers Co.* (1929), 255 Ill. App. 216; 24 Ill. L. & Prac. *Landlord and Tenant* §334 (1956); see also *Ira Handleman Building Corp. v. Dolan* (1957), 15 Ill. App. 2d 49, 145 N.E.2d 250 (abstract)). It is not essential that there be an express intention of the landlord to compel a tenant to leave the demised premises or to deprive him of their beneficial enjoyment, since persons are presumed to intend the natural and probable consequence of their acts and, accordingly, acts or omissions of the landlord making it necessary for the tenant to move from the demised premises constitutes a constructive eviction. (*Woods Theatre*.) The

question as to whether there has been a constructive eviction is one of fact (*Automobile Supply Co. v. Scene-in-Action Corp.* (1930), 340 Ill. 196, 172 N.E. 35), and a reviewing court will not disturb the finding unless it is manifestly against the weight of the evidence (*Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 232 N.E.2d 485).

In essence, defendants take the position that because of breaches by plaintiff of lease provisions, the trial court improperly found a constructive eviction. They support their position with the following contentions.

First, they argue that plaintiff abandoned the premises before the expiration of the 90 days allowed in the lease for them to obtain reinstatement of the MID number, and that plaintiff also failed to send a notice of termination after the 90-day period as provided in the lease. We see no merit in this contention. Neither of these provisions became operative, as the MID number was never reinstated. Furthermore, we note no clause in the lease requiring plaintiff to cease its business during the 90-day period or, for that matter, during the withdrawal of the MID number. Nor was plaintiff prevented by the lease from conducting its business elsewhere. When the MID number was withdrawn, plaintiff necessarily had to relocate in a building having such a number in order to continue its business. As to the notice of termination, plaintiff agrees that it sent no such notice; thus, had the MID number been reinstated within the 90-day period, it appears that plaintiff would have continued to be bound by the provision of the lease, subject of course to any claim for damages it may have had against defendants for period of withdrawal. In this regard, there is evidence that plaintiff expected to be so bound, as indicated from the testimony of its president and defendant Melvin Gartenberg that plaintiff had offered to return to the premises as soon as the number was reinstated.

Secondly, defendants argue plaintiff breached its duty to cooperate in obtaining the reinstatement of the MID number. The lease required plaintiff "to extend necessary cooperation to permit the required work to be done" in order to secure reinstatement. Defendants admit that the lease required them to correct most of the deficiencies set forth in the MID letter. (Under the lease, defendants required to maintain all of the premises—including those occupied by Opal but not the premises occupied by plaintiff.) But they contend that some of the deficiencies were the responsibility of plaintiff and, because of the failure of it to make those corrections, the court improperly found a constructive eviction.

It was the testimony of plaintiff's president that the 21 conditions listed in the MID letter found by Inspectors Crawford and Bonkowski to be present on February 10, 1972, were not the responsibility of plaintiff. Defendants, on oral argument, agreed that this was the fact, but they

assert that some of the 11 conditions mentioned in the MID letter as having been found on February 2, 1972, were the responsibility of plaintiff. They do not specify which are chargeable to plaintiff, and we have reviewed the record to ascertain the correctness of this assertion. We have found that plaintiff's president testified that conditions 1, 4, 5, 7, 8 and 9 involved either common or Opal areas and, in any event, did not involve the premises leased by plaintiff; that condition 2 involved a storage area (of which there were many), and he did not know which was referred to; that condition 3 concerned overhead doors (of which there were more than one), and he did not know which was supposed to be deficient; that condition 6 was a common area but was used by plaintiff for about three hours on one occasion for defrosting meat, and that there was an alternative means of entry to that area by using the elevator; and that conditions 10 and 11 did concern plaintiff's premises but that each had been corrected. This testimony was unrebutted, and no evidence was introduced that conditions 2 and 3 concerned plaintiff's premises; thus, we find that the record does not support defendants' contention that plaintiff was required to correct any of the deficiencies listed in the MID letter. So also do we fail to see any significance in the reference in that letter to the 33 instances of inspections having been withheld. From the testimony of plaintiff's president and Inspector Bonkowski, it is clear that they were sanitation deficiencies, and that all had been corrected—some within minutes—and none caused a withholding of inspection for more than a few hours.

■■ In view of the foregoing, we cannot say that the finding of a constructive eviction was against the manifest weight of the evidence.

Defendants also contend that the damage awarded was excessive. He argues that there is nothing in the record indicating any effort by plaintiff to minimize damage by attempting to find a suitable location having a rental closer to the $500 monthly rental it was paying defendants than to the $3,400 per month it agreed to pay under the new lease. Plaintiff admits it did not offer evidence as to mitigation of damages and, in excuse thereof, states in its briefs (without support in the record) that it was forced to find a new location to operate as soon as possible or suffer an even greater loss by a complete shutdown of its business.

It appears from the evidence that after certain adjustments for electric bills, there was a difference in rent between the two leases of $2,316 per month which, for the 40 months remaining in the lease with defendants, amounted to $92,640. The court awarded damages of exactly one-half of that amount, but there is nothing in its order or in the record to indicate the basis of this action.

Neither party has cited any authority as to the measure of damage which should be applied here, and there appear to have been only a few

cases which have given any indication of the rule to be followed. We note, however, that in 49 Am. Jur. 2d *Landlord and Tenant* §324 (1970), the rule was stated in wrongful eviction cases as follows:

"In addition to the value of the unexpired term and any direct and reasonably certain lost profits, the tenant may recover compensation for any other loss which results to him as a direct and natural consequence of the landlord's wrongful act, and which is not attributable to his own fault or want of care."

(See also Williston on Contracts §1404 (3d ed. 1968).) In *Zion Industries, Inc. v. Loy* (1977), 46 Ill. App. 3d 902, 361 N.E.2d 605, which involved a failure of the landlord to perform a covenant to repair the roof of a leased building, the court stated:

"Loy [tenant] is entitled to the damages which necessarily have directly resulted from the failure to perform the covenant in question because, otherwise the covenant would be meaningless * * *." (46 Ill. App. 3d 902, 912, 361 N.E.2d 605, 612.)

In *Griesheimer v. Bothman* (1903), 105 Ill. App. 585, it was also held that the measure of damage in a breach of lease covenants was not limited to the value of the unexpired term but included other damages resulting from the breach. The right to such damages, however, is conditioned on a reasonable effort being made to minimize the loss. (49 Am. Jur. 2d *Landlord and Tenant* §187 (1970); *Kelly v. Chicago Park District* (1951), 409 Ill. 91, 98 N.E.2d 738.) See also *Dobbins v. Duguid* (1872), 65 Ill. 464, where, as early as 1872, this was held to be a requirement.

The applicable rule is also and possibly more appropriately termed the doctrine of avoidable consequences, which is described in 22 Am. Jur. 2d *Damages* §30 (1965), as follows:

"This doctrine states that a party cannot recover damages flowing from consequences which that party could reasonably have avoided. Often this is expressed as a *duty* on the part of the plaintiff to minimize his damages or as an *obligation* to take reasonable action to avoid enhancing the damages caused by defendant. Such statements are inaccurate expressions of the doctrine of avoidable consequences because, like the other principles limiting recoverable damages, the failure to take reasonable action to limit damages creates no affirmative right in anyone. The only result of such a failure is that the court will not allow damages for those consequences of the injury which it believes the plaintiff could reasonably have avoided. Thus, this doctrine should be viewed as disability on (or a 'no right' to) recovery of reasonably avoidable damages."

■■ Here, the difference in rent could be a natural consequence of the wrongful eviction. (See Annot., 7 A.L.R. 1103, 1108 (1920), citing *J.B.*

*Sanborn Co. v. Marquette Building Co.* (1900), 86 Ill. App. 681.) However, we note that although plaintiff's evidence indicated a rental difference in its two leases in the amount of $92,640 for the 40 months remaining in its lease with defendants, the court awarded damages in exactly one-half of that amount. Not only do we see no basis in the record for an award in this amount, but it also appears that there was no evidence offered by plaintiff of a reasonable effort to limit the extent of its damages. We are unable to ascertain the yardstick used by the trial court, but we think it clear that it did not apply the proper measure of damages; namely, that plaintiff would be entitled to those damages which can be ascertained with a reasonable degree of certainty and can properly be said to have been the natural or usual result of the breach of the lease covenants, subject however to a reasonable effort on plaintiff's part to limit its loss. In view thereof, we believe the trial court erred in its assessment of damages, and we will vacate its award.

■■ Finally, defendants contend that their counterclaim for rent due on the unexpired term of the lease should not have been denied. We disagree. Plaintiff, having been constructively evicted from the premises, was no longer required to pay rent (*Talbot v. Citizens National Bank* (7th Cir. 1968), 389 F.2d 207), and therefore the counterclaim was properly denied.

For the foregoing reasons, the judgment is affirmed as to the liability issues but reversed as to the award of damages, and the cause is remanded to the circuit court of Cook County for a new trial on the issue of plaintiff's damages only consistent with the content of this opinion.

Affirmed in part.

Reversed and remanded in part.

MEJDA and WILSON, JJ., concur.