The CONTINENTAL GROUP, INC.,
Plaintiff-Appellee,

v.

LINCOLN LAND MOVING AND STORAGE, INC., Defendant-Appellant.

No. 81–2450.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1983.

Decided June 21, 1983.

Paul G. Foran, Doggett & Foran, Danville, Ill., for defendant-appellant.

Michael R. Feagley, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH and COFFEY, Circuit Judges, and WISDOM, Senior Circuit Judge.*

---

* The Honorable John Minor Wisdom, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

COFFEY, Circuit Judge.

This diversity action was brought by Continental Group, Inc. against Lincoln Land Moving and Storage, Inc., alleging that the defendant warehouse operator violated the duty of reasonable care owed to the plaintiff in contaminating the property (cans) of Continental Group that had been stored in the warehouse. The defendant denied violating its duty, and in addition asserted that Continental Group was responsible for all of the damages because it had: (1) been contributorily negligent; (2) assumed the risk of contamination; and (3) failed to mitigate its damages. The case was tried to the court and a $88,003.49 judgment in favor of the plaintiff was entered. The identical assertions made by the defendant at trial are repeated on appeal. We affirm the judgment of the trial court.

The Continental Group, Inc., ("Continental"), the plaintiff, is a New York corporation engaged in the manufacture of cans. The defendant, Lincoln Land Moving and Storage, Inc., ("Lincoln Land"), is an Illinois corporation licensed as a warehouse operator and publicly engaged in warehousing goods for a tariff. This lawsuit involves millions of cans stored by the plaintiff in a warehouse owned and operated by the defendant.

In 1968, Continental Group began storing large quantities of its empty aerosol cans at Lincoln Land's warehouse in Danville, Illinois. During the early 1970's, various customers of Continental Group complained from time-to-time about the dirty condition of some of the cans they received, more particularly that some cans were contaminated and coated with a grease, a lubricant or other foreign substance. All of these contamination complaints turned out to be the result of manufacturing-related problems. During 1973 and early 1974, Mr. Philip Spletzer, then manager of Continental's Danville, Illinois can manufacturing plant routinely visited Lincoln Land's Danville warehouse every two or three weeks to

inventory the cans and to check the general condition of the warehouse but did not specifically inspect the stored cans for cleanliness.

In April of 1974, a Continental customer, Peterson/Puritan, Inc., complained about the condition of 7,475 cans from an earlier shipment of 207,000. Records of the customer and Continental described the problem as "dirty domes—grease on sides of cans" and "excessive dirt on domes and can bodies on a slug basis." [1] On April 29, 1974, Spletzer inspected the Lincoln Land warehouse in connection with the customer complaint. Spletzer noted in a report that the purpose of this inspection was to check out the order and cleanliness of the warehouse and its contents due to a high incidence of poor quality of the cans coming from the Lincoln Land warehouse. He further reported that the warehouse was in a "deplorable condition" and that there was a "black film on [the] white domes of cans" and "a light showing of black oily film." At the time of his inspection, Spletzer informed Lincoln Land representatives that Continental employees would be doing further checking of the warehouse conditions. Approximately one week after his inspection on April 29, 1974, Spletzer again inspected the Lincoln Land warehouse and found that its cleanliness had improved. The plaintiff continued to store cans in the defendant's warehouse and ship them to customers during the summer and fall months of 1974 without complaint.

But on November 14, 1974, Peterson/Puritan, Inc. again complained about the dirty condition of the cans and rejected more than 800,000 of the plaintiff's aerosol cans, including two entire shipments from Lincoln Land. The customer's records described the problem with the cans from Lincoln Land as "very dirty domes—caused line to be shut down—when the can was filled with propellant the dirt formed a ring on the top of the can" and "dirt and dust

---

1. According to a Continental representative, a slug defect is a problem—*e.g.*, grease deposits—that occurs in a short but continuous sequence of cans during the manufacturing process.

inside shrink wrap and greasy film on domes."

Some five days later, on November 19, 1974, several representatives of Continental went to the warehouse to inspect the rejected cans. During the inspection, one of the representatives was almost injured by a forklift operating in the area. At this time the forklift was observed spewing forth grimy, black exhaust clouds directly onto nearby pallets of cans. After observing the forklift exhaust problem, the representatives decided to expand their inspections to include samples of the other cans in the warehouse. The plaintiff's inspection revealed that cans that had been at Lincoln Land for as short a time as only 11 days were contaminated by a dark oily film. The Continental representatives concluded that the cans should be removed from Lincoln Land to prevent additional damage and they recommended that all of the cans that had been in the warehouse for four months or more be cleaned before being sent to customers.

Continental began removing its cans from the warehouse within a week after the November 19, 1974 inspection. The cans were either sent directly to customers without being cleaned or were sent to Continental manufacturing plants for cleaning. Those cans sent to the customers without cleaning were sent in the hope that the customers might not reject them, thus saving Continental sales and the expense of cleaning or scrapping them. If the customers rejected the cans, Continental tried to clean them but the effort was both expensive and unsuccessful.

In late December of 1974, at Continental's request, Lincoln Land removed the diesel forklift truck apparently causing the contamination problem and replaced it with one with a gasoline engine. In December of 1974 and January of 1975, Continental attempted to find other warehouse space in Danville to store its cans. The last of the contaminated cans were removed in March of 1975 and Continental was ultimately forced to scrap most of the cans which had been stored at the Lincoln Land warehouse.

Continental filed this action, following the removal of the contaminated cans from the defendant's warehouse and the unsuccessful attempts at salvaging them, alleging that during the period that the contaminated cans were stored in the defendant's warehouse the defendant was negligent in failing to exercise proper care of the goods. The defendant countered by contending that the plaintiff was contributorily negligent, assumed the risk of contamination of the cans and failed to avoid its damages by subjecting the cans to the known dangers of storage at the defendant's warehouse. The district court found the assertions of the defendant to be without merit and entered judgment for the plaintiff:

"Under the provisions of Ch. 26, Section 7–204, Ill.Rev.Stat., and the theory upon which the parties tried the case, the plaintiff was required to prove the following propositions:

1. bailment of its cans to the defendant;

2. delivery of the cans in good condition;

3. receipt of the cans in a damaged condition;

4. in the normal course of events the damage would not have occurred if the defendant had used reasonable care;

5. damages.

"Proof of those propositions raises a presumption of negligence on the part of the defendant which the defendant had to rebut . . . the plaintiff went beyond the propositions it was required to prove and offered evidence tending to prove the proximate cause of the damages. The defendant not only failed to rebut the presumption of its negligence but it failed to offer sufficient evidence to rebut the cause of the damage and to show the exercise of due care on the part of the defendant. In fact, as commented above, the preponderance of the evidence shows that the defendant knew or should have known the result would occur. The preponderance of evidence adduced was that warehousemen handling goods like the plaintiff's cans did not use diesel or gaso-

line powered forklifts, but used electric or propane lifts.

"I conclude the defendant failed to exercise the care a reasonably careful man would exercise under like circumstances and that failure was a proximate cause of the plaintiff's damages."

The district court did not accept Lincoln Land's contentions that the plaintiff should have been aware of the contamination problem, holding:

"Phillip [sic] Spletzer, the Continental manager who visited the Lincoln Land warehouses, did not do so with the sufficient frequency to make him realize that the diesel forklifts were contaminating the stored cans. He did know that diesel forklifts were being used but I find under all these circumstances that is not sufficient to have put him on notice that the cans were likely to be contaminated.... It was only after Continental customers began to complain that Continental came to the realization that their stored cans were being contaminated by the diesel smoke from defendant's forklift trucks. It was [the Continental representative's] experience with the diesel forklift on November 19, 1974 that first made him think that the diesel engines might be causing the contamination.

"Continental was aware that dust settles on cans stored in warehouses and that it is an expected condition. Continental customers realize that as well. The testimony shows that when cans are filled by a Continental customer the cans are first put through a hot soap bath to wash off the dust which accumulates on the cans in storage. The combination of the dust and the oily exhaust forming a film on the cans, only came to Continental's attention when its customers began to complain."

The trial court found that Continental Group did not assume the risk of contamination, stating:

"Assumption of the risk can have no application here. One of the required elements of assumption of the risk is that the plaintiff know subjectively the risk involved and willingly undertake the risk. If the Continental employees cannot be said to have known the risk in the exercise of ordinary care then there can be no foundation for an assertion that they subjectively understood the risk and assumed it knowing the consequences. Moreover, assumption of the risk is an affirmative defense in Illinois, placing the burden of proof on the defendant. The defendant has failed to carry that burden of proof."

Additionally, the court determined that the plaintiff's damages were not caused by any inaction on the part of the plaintiff in removing its cans from the warehouse. The district court noted:

"I find no basis for the claim of failure to mitigate the damages. There is nothing in the evidence which indicates to me that the plaintiff puffed the damages or permitted the damages to be aggravated. The fact that the cans remained in the defendant's warehouse from April, 1974 through February or March of 1975 I find not to be an unreasonable length of time for the removal under the circumstances. The management considerations of cost of removal, ability to salvage and finding a new place for storage are legitimate business reasons for the delay in the removal of the cans.

"The plaintiff is entitled to recover in damages the sum of money equal to its cost in cleaning the cans which were cleaned plus the fair market value of scrapped cans less the value of the scrap."

The defendant warehouse operator appeals to this court from the district court's entry of judgment in favor of the plaintiff. The sole issue on appeal is whether the trial court erred in failing to accept the defendant's defenses of contributory negligence, assumption of the risk and failure to mitigate damages.[2] The determining factor is

2. It is unclear whether the Illinois Supreme Court would accept an "assumption of risk" defense in a bailment action such as the in-

stant. *See Barrett v. Fritz*, 42 Ill.2d 529, 248 N.E.2d 111, 115 (1969). Even assuming that such a defense is available to the defendant, a

whether on April 29, 1974 (the date of Philip Spletzer's warehouse inspection following the first exhaust-related complaint) Continental knew, or should have known, that its cans were being contaminated while stored at Lincoln Land.[3]

## I.

■ Determination of whether a plaintiff was contributorily negligent is ordinarily a factual issue to be decided by the trier of fact. *Osborne v. Sprowls,* 83 Ill.App.3d 968, 972, 39 Ill.Dec. 474, 477, 404 N.E.2d 1065, 1068 (3d Dist.1980). The defendant, however, contends that the district court's finding herein on the issue of contributory negligence presents a question of law and is subject to full *de novo* review on appeal because the evidence relevant to this issue is undisputed. We disagree as differing inferences can be drawn from undisputed facts.

"The question of negligence does not become a 'question of law' unless the evidence is such that all reasonable minds would agree that defendant was not negligent in his acts or that the injury was the result of the plaintiff's own negligence.... Even where the facts are admitted or undisputed but where a difference of opinion as to the inference that may legitimately be drawn from them exists, the questions of negligence and contributory negligence ought to be submitted to the jury—it is primarily for the jury to draw the inference ...."

*Piper v. Lamb,* 27 Ill.App.2d 99, 108–09, 169 N.E.2d 164, 168 (3d Dist.1960) (citations omitted).

■ The trial court's factual findings that Continental Group could not have known of the forklift-related contamination and, therefore, was not contributorily negli-

gent, did not assume the risk and did not fail to mitigate its damages, will only be reversed on appeal if they are clearly erroneous. The findings of the district court will be sustained unless they are clearly against the manifest weight of the evidence. Fed.R.Civ.P. 52(a). *See Jefferson Nat. Bank v. Central Nat. Bank in Chicago,* 700 F.2d 1143, 1155 (7th Cir.1983). Our review of the record herein discloses that the district court's determination that Continental Group was not contributorily negligent is supported by substantial evidence and we hold that that finding is not clearly erroneous.

As the defendant concedes, the crucial inquiry herein is whether Continental Group did not know (and had no reason to know) prior to November 19, 1974 that Lincoln Land was subjecting the stored cans to continuing contamination. As noted by the district court in its findings of fact:

"Phillip [sic] Spletzer, the Continental manager who visited the Lincoln Land warehouse, did not do so with sufficient frequency to make him realize that the diesel forklifts were contaminating the stored cans. He did know that diesel forklifts were being used but I find under all circumstances that is not sufficient to have put him on notice that the cans were likely to be contaminated."

Prior to his inspection of April 29, 1974 (in response to Peterson/Puritan's first complaint), Spletzer had not inspected the condition of the cans stored at Lincoln Land's Danville warehouse but rather his visits were to check on the general housekeeping and orderliness of the warehouse and to assess the inventory. Peterson/Puritan's complaint of April 1974 regarding dirty cans described a condition wholly consistent with the earlier temporary manufac-

---

required element is knowledge of the risk, a factor not present herein until November of 1974 and, thus, the defendant cannot avail itself of this defense.

**3.** As noted by the defendant in its appeal to this court:

"Obviously the validity of the defenses Defendant raised at trial and now raises on appeal, turn[s] on the awareness of Plaintiff's

Plant Manager that the black, oily film was accumulating on its cans as of April 29, 1974.

"Thus, if he was aware, then Plaintiff's failure to remove its cans and the shipment of additional millions of cans must be construed as actions by the Plaintiff which contributed to and certainly aggravated its damages."

turing malfunction problems in that it referred to a problem described as "dirty domes—grease on sides of cans" and "excessive dirt on domes and can bodies on a slug basis" and involved only 7,475 cans out of a lot of 207,000.

After receiving the first Peterson/Puritan complaint, Continental's Mr. Spletzer visited Lincoln Land's warehouse on April 29, 1974 and noticed that it was in a filthy, disorderly condition and observed a black film on the stored cans inspected. The trial court determined that at the time of Spletzer's visit to the Lincoln Land warehouse, the plaintiff was not put "on notice" that the defendant's forklifts were responsible for the oily film, nor made aware that the contamination was anything more than a limited, isolated problem similar to those caused by temporary manufacturing apparatus malfunctions and the inherent dusty conditions of warehouse facilities.[4]

When Spletzer returned to the defendant's warehouse approximately one week after the April 29, 1974 visit, the cleanliness of the facility had improved and this condition of improved cleanliness apparently continued until November 14, 1974 when Peterson/Puritan again complained. At this time, Peterson/Puritan rejected 800,000 cans due to a greasy film on the domes of the cans. It was during the inspection following this rejection that an official of Continental was almost struck by one of the defendant's forklift trucks and it was fortuitously noticed by the inspecting officials at this time that the diesel forklift was spewing forth heavy black smoke directly onto the stacked pallets and covering the stored cans with a dirty, oily film.

The district court determined that the November 19, 1974 incident put the plaintiff on notice that the contamination of its cans was possibly the result of the defendant's warehouse operation. The trial court also determined that the plaintiff acted reasonably in gradually withdrawing its empty cans from the warehouse.[5] According to the trial court, "[t]he management considerations of cost of removal, ability to salvage, and finding a new place for storage [were] legitimate business reasons for the delay in removal of the cans."

After a review of the record, we hold that the finding of the trial court that the plaintiff was not contributorily negligent is reasonable and is supported by substantial evidence. An appellate court's function is limited and we will not retry a case *de novo*. *Economy Fire & Cas. Co. v. Beeman*, 656 F.2d 269, 274 (7th Cir.1981). It is the fact finder's function to hear, observe and judge the credibility of the witnesses and to weigh the conflicting evidence. *See Jefferson Nat. Bank*, 700 F.2d at 1156. We affirm the trial court's decision granting judgment in favor of the plaintiff as we are convinced that no error was committed.

---

4. Although Spletzer noted that his visit was prompted by a "high incidence of poor quality coming from the Lincolnland [sic] Warehouse," the record is silent as to the origin of the problem. It is impossible to tell whether Spletzer was referring to manufacturing related defects or damages caused by shipping or storage conditions.

The defendant does not dispute Continental's contention that no exhaust-related complaints were received prior to April of 1974. In fact, Lincoln Land affirmatively states:

"Prior to Continental's complaint regarding the cans that are the subject of this lawsuit in 1974, Defendant had received no complaints from any source about the accumulation of such oily film on any merchandise stored in the warehouse."

5. The trial court's reference to a "duty to mitigate damages" may have more appropriately been considered as the "doctrine of avoidable consequences." *See John Munic Meat Co. v. H. Gartenberg & Co.*, 51 Ill.App.3d 413, 9 Ill. Dec. 360, 365, 366 N.E.2d 617, 622 (1977). Pursuant to this doctrine, a "court will not allow damages for those consequences of the injury which it believes the plaintiff could reasonably have avoided." *John Munic*, 9 Ill.Dec. at 365, 366 N.E.2d at 622.