**WESTERN ASSETS CORPORATION,**
Plaintiff-Appellee,

v.

**The GOODYEAR TIRE & RUBBER CO., Defendant-Appellant.**

No. 83–2999.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1984.

Decided April 8, 1985.

Marguerite M. Tompkins, Jenner & Block, Chicago, Ill., for plaintiff-appellee.

John M. Touhy, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellant.

Before ESCHBACH, COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

The defendant, The Goodyear Tire & Rubber Co. ("Goodyear"), appeals the district court's determinations that it wrongfully terminated its lease with the plaintiff, Western Assets, and that it was liable for damages to the leased premises that occurred both before and after Goodyear terminated its lease. We reverse the district court's judgments that Goodyear wrongfully terminated its lease and that Goodyear was responsible for damage to the leased premises occurring after the termination. We affirm the district court's judgment as to the pre-termination damage.

## I.

The following evidence was presented at a bench trial in the district court. On September 24, 1976, Goodyear, an Ohio corporation, leased a commercial warehouse building located at 1814 North 15th Avenue, in the Village of Melrose Park, Illinois ("Village") from Western Assets, an Illinois corporation. Goodyear leased the premises for a five-year term for a wholesale tire center. The lease permitted Goodyear

> "to use and occupy the premises for the sale of such products and furnishings of such services as in Goodyear service stores generally, including but not limited to the servicing, storing and repairing of motor vehicles, and the selling to consumers and to others in the servicing of tires, tubes, oil and other lubricants, motor and tire accessories and kindred products, or for any other lawful purposes."

In addition, the lease provided that Goodyear could "assign this lease or sublet the premises or any part thereof." As part of their obligations under the lease, the les-

sor, Western Assets agreed to "make all ... building changes or installations required to conform with applicable laws and ordinances." The lease further recited that, "[a]t Lessee's option, this lease shall not become binding on Lessee until Lessor shall obtain such certificates of occupancy, permits, waivers and consents as may be required as authority for the use of the premises for the purposes set forth herein." In addition to its obligation to conform the building to all applicable laws and ordinances, Western Assets agreed to "keep the exterior of the premises, including the foundations and roof, in good condition and repair." The tenant, Goodyear, agreed not to "commit any undue waste on the premises" and to "surrender the premises to Lessor in substantially as good condition of repair as when received, ordinary wear and tear, damage by fire, the elements and unavoidable casualty excepted" at the termination of the lease. The parties additionally agreed that, "if ... by reason of any law or ordinance, or by court decree, whether by consent or otherwise, use of the premises by Lessee for any of the specific purposes herein before referred to shall be prohibited, Lessee shall have the right to terminate this lease upon written notice to Lessor, and rental shall be paid only to the time when Lessee surrenders possession of the premises."

Goodyear moved into the leased premises, a warehouse, on or about February 1, 1977 and submitted an application for a business license to the Village of Melrose Park on February 4, 1977. Goodyear's application was processed by Lt. Albert Lewis of the Melrose Park Fire Prevention Bureau, who, following customary procedure, inspected the premises on February 14, 1977, and prepared an inspection report. On that date, the Melrose Park Fire Chief advised Goodyear by letter of seven items to be corrected before the Village would issue a certificate of occupancy to Good-

year. Specifically, the letter informed Goodyear that the "building shall be protected by an automatic sprinkler system in its entirety within the next thirty-six months." Western Assets assured Goodyear that each of the seven items would be corrected. Western Assets began negotiations with the Village concerning the sprinkler system and was advised that the sprinkler system was required by chapter 94.14 of the Melrose Park ordinances.[1] On June 6, 1977, Western Assets and the Village signed a written agreement in which the Village agreed to issue a certificate of occupancy for Goodyear conditioned upon Western Assets agreeing to install a sprinkler system in the warehouse by June 6, 1980. The Village issued a certificate of occupancy and Village officials formally approved Goodyear's use of the warehouse to conduct its business. Goodyear opened its wholesale tire center on May 2, 1977, and conducted its wholesale tire business in the warehouse without interference from Village officials.

Because the tire center was unprofitable, Goodyear closed the tire center in the warehouse in the fall of 1979 and informed Western Assets that it was looking for an opportunity to lease the warehouse to a subtenant. During this period, Goodyear continued to use the premises for storage purposes while paying rent.

On April 8, 1980, Lt. Lewis wrote Western Assets requesting three copies of the blueprints for the sprinkler system in order that they might be reviewed by the Building and Fire Departments before they commenced work on the installation of the sprinkler system. Lt. Lewis also reminded Western Assets that the completion date for installation of the sprinkler system was June 6, 1980. Western Assets responded by requesting an extension of time from the Village for installing the sprinkler system. Even though the Village denied the

---

1. Chapter 94.14 of the Melrose Park Ordinances provides, in part, that:
 "Automatic Sprinkler Systems shall be installed in any building hereafter erected, altered or converted as follows:

A. In all buildings or structures for the manufacture, storage or sale of combustible goods, [or] merchandise over 7,000 square feet...."

request for an extension of time, Western Assets failed to install the sprinkler system. Goodyear continued to use the warehouse for storage purposes.

Beginning in the fall of 1979, Goodyear experienced difficulties with a leaking roof which caused damage to the interior of the warehouse, including damage to the ceilings, walls and the floor. Western Assets hired a contractor, Carl Aiello, to inspect the roof in late 1979 or early 1980 and, after finding that the roof leak was caused by clogged roof downspouts, Mr. Aiello cleaned the downspouts and patched the roof. Despite Mr. Aiello's efforts, the roof continued to leak. Goodyear informed Western Assets that the roof was leaking and causing damage to the interior of the leased premises on two separate occasions, June 18, 1980 and August 18, 1980.

After Goodyear terminated its wholesale business operations and began using the warehouse for storage purposes, a local trucker, Earl Filskov, contacted the rental agent to inquire about using the parking lot of the premises. The rental agent referred Filskov to the Goodyear real estate manager who authorized Filskov to use the parking lot of the premises for his trucking operations in exchange for his performing exterior maintenance tasks such as maintaining the lawn and shrubbery and removing trash. Filskov failed to keep his part of the agreement with Goodyear, permitted his truckers to dump refuse and debris in the parking lot, and failed to maintain the lawn and shrubbery. Furthermore, vehicles were abandoned on the premises by unknown persons. On April 9, 1980, Lt. Lewis wrote Goodyear complaining about the premises surrounding the exterior of the building. On June 5, 1980, Village officials inspected the warehouse and reported 35 code violations to the rental agent including exposed electrical wiring; damaged walls, ceiling and floor tiles; broken and boarded up windows; a damaged overhead door; and the lack of a sprinkler system. The rental agent forwarded the inspection report to Mr. Aiello who, after inspecting the premises, prepared estimates of the cost to correct the building code violations.

Lt. Lewis informed Goodyear during the time they searched for a sublessee that "[a]n automatic sprinkler system must be installed [in the warehouse] conforming to ... chapter 94 of the Revised Municipal Code of Melrose Park." Goodyear advised Western Assets that the Village would not allow the warehouse to be reopened and occupied until a sprinkler system was installed. In its response, Western Assets reminded Goodyear that Goodyear was aware that the building did not have a sprinkler system when it moved in. The letter further informed Goodyear, "[y]ou have an occupancy permit for the building and you are entitled to occupy the building for the period of your lease which I would recommend that you follow through on unless you want to pay for the sprinkler system that needs to be installed." Goodyear denied taking the building "as is" and continued to insist that Western Assets install the sprinkler system. In September, 1980, Goodyear entered into a sublease for the warehouse with Atlas Pallet & Box, Inc. ("Atlas"). Because the Village ordinances required a new occupancy permit be issued whenever there was a change in the tenant or the use of a commercial building, Goodyear's real estate representative met with Village officials to determine if the Village might issue an occupancy permit to Atlas even though the warehouse did not as yet have a sprinkler system. Goodyear's real estate representative, George McCormick, was informed by Constantine Stamatakos, the Building Commissioner of Melrose Park, Lt. Lewis, and August Taddeo, the Mayor of Melrose Park, that Atlas could not occupy the warehouse and that Goodyear could not reopen its business until a sprinkler system was installed in compliance with Village ordinances. On September 29, 1980, Goodyear sent Western Assets written notice of termination and surrendered possession of the warehouse October 1, 1980. After Goodyear terminated the lease and surrendered possession of the premises, the warehouse was severely damaged by vandals.

Two months later, on December 2, 1980, Western Assets filed suit for rent, interest and damages claiming that Goodyear's termination of the lease was wrongful and that Goodyear failed to return the warehouse in as good a condition as when received. After a bench trial, the district court found that "Western Assets leased the premises to Goodyear for the specific purpose of operating a wholesale truck tire center, including servicing, storage, and repair of motor vehicles, sales to customers, and other lawful purposes related to the conduct of such operation by Goodyear ... [and that] Western Assets had no obligation to procure a certificate of occupancy for Goodyear's proposed subtenant." The court further found that "[t]he right to cancel provided in Paragraph 16(a) of the Lease [was] restricted to use of the premises by Goodyear." Therefore, "Goodyear's inability to obtain a certificate of occupancy for Atlas did not constitute a prohibition of use under Paragraph 16(a) of the Lease and did not entitle Goodyear to terminate the lease." The district court concluded that Goodyear breached the lease by vacating the premises and failing to pay rent after September 30, 1980. Furthermore, the district court held that the roof leakage was caused by "an accumulation of trash and debris in the downspouts which prevented proper drainage and caused water to seep under the roof flashings and onto the ceiling inside the building." The judge concluded that, "leakage in the interior of the building as a result of Goodyear's failure to clear the downspouts caused damage to the interior walls, ceiling and floor tiles in the office areas of the premises." Additionally, the district court found that the building was unattended and unoccupied during the winter, spring, and summer of 1980, and suffered damage as a result of vandalism and neglect. Furthermore, the warehouse continued to suffer damage as a result of vandalism after Goodyear terminated the lease on September 30, 1980. The district court concluded that Goodyear was liable "for all damages occurring to the premises after November of 1979 as a result of Goodyear's failure to maintain the premises in as good a condition and repair as when it received them." The court awarded Western Assets Corporation unpaid rent, interest, and damages.

## II.

### A. Whether Goodyear Wrongfully Terminated the Lease.

██ Both parties agree that the law of Illinois governs the interpretation of the lease. When there is no dispute as to the facts and the only duty imposed on the trial court is to interpret a lease, the lease may be construed and its legal effect determined by an appellate court. *See Staker v. Commercial Discount Corp.*, 19 Ill.App.2d 573, 154 N.E.2d 855 (1958); *Fichter v. Milk Wagon Drivers' Union, Local 753*, 382 Ill. 91, 46 N.E.2d 921 (1943). In construing a lease, a court is to give effect to the intention of the parties as expressed in the language of the document when read as a whole. *Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 247 N.E.2d 886 (1969). Where the language of the lease is unambiguous, the intention of the parties must be ascertained from the language of the lease alone. *The Great Atlantic and Pacific Tea Co., Inc. v. LaSalle National Bank*, 77 Ill.App.3d 478, 32 Ill.Dec. 812, 395 N.E.2d 1193 (1979). *See also Sunstream Jet Exp. v. International Air Service Co.*, 734 F.2d 1258, 1267 (7th Cir.1984). In Illinois, a written lease is construed in the same manner as all other written contracts. *Hoffman v. Clark Street Roadhouse, Ltd.*, 79 Ill.App.3d 41, 34 Ill.Dec. 563, 398 N.E.2d 238 (1979). Our initial inquiry is whether the district court correctly interpreted the lease between the parties. The lease expressly provides that Goodyear could use the warehouse for three purposes: (1) as a wholesale tire center; (2) "for any other lawful purposes"; (3) to sublet. The district court, however, found that "Western Assets leased the premises to Goodyear for the specific purpose of operating a wholesale truck tire center ... and other lawful purposes related to the conduct of such an operation by Goodyear." The specific issue, therefore,

is whether the district court is correct in holding that the paragraph authorizing a specific use as a wholesale tire center restricted Goodyear's use of the warehouse to the specific use as a tire center. In *Chicago Title & Trust Co. v. Southland Corp.*, 111 Ill.App.3d 67, 66 Ill.Dec. 611, 443 N.E.2d 294 (1982), the Illinois Appellate Court interpreted a lease providing "Lessee is hereby given the privilege of using the leased premises as a grocery store ... or for any other lawful purpose." The court rejected the lessor's contention that the use provision created an implied covenant to continue operating a grocery store holding that the language, "any other lawful purpose," permits the lessee to use the premises for uses other than a grocery store so long as the use was lawful. *Id.* 66 Ill.Dec. at 613–14, 443 N.E.2d at 296–97. Because the lease clause allowed Goodyear to use the warehouse as a wholesale tire center "and for any lawful purpose," we hold that under Illinois law, Goodyear's use of the building was not limited to the operation of a tire center but could also be used "for any lawful purpose." Furthermore, the lease expressly granted Goodyear the right to sublet as long as it was for a lawful purpose. Because Goodyear could use the premises for any lawful purpose and was allowed to sublet the premises, the district court erred as a matter of law when it only recognized one use by Goodyear—as a wholesale truck tire center.

We now turn to the question of whether the lessor breached the lease when it failed to install the sprinkler system on or before June 6, 1980. The parties expressly agreed that, "[t]his lease shall not become binding on Lessee until Lessor shall obtain a certificate of occupancy, permits, waiver and consent as may be required as authority for the use of the premises...." Additionally, the lease imposed upon Western Assets the duty to "make all ... building changes or installations required to conform with all applicable laws and ordinances respecting the use of occupancy thereof...." Western Assets chose to perform its obligations to "conform the building to Village ordinances" and to obtain a certificate of occu-

pancy by negotiating with the Village for a 36-month grace period in which to install the sprinkler system. The Village issued an occupancy permit to Goodyear and suspended the sprinkler system requirement for 36 months conditioned upon Western Assets' promise to install the sprinkler system within the 36 month period. However, Western Assets failed to fulfill its agreement with the Village regarding the installation of the sprinkler system within 36 months, the promise upon which the Village conditioned issuing the occupancy permit to Goodyear and suspending the sprinkler system requirement. When Goodyear's real estate representative, George McCormick, met with Lt. Lewis on September 24, 1980, Lt. Lewis informed McCormick that no one would be allowed to occupy the warehouse until a sprinkler system was installed. The two men thereafter consulted the Mayor of Melrose Park and the Building Commissioner, two of the three officials authorized to review and revise Lt. Lewis' decisions, and neither the Mayor nor the Building Commissioner overruled Lt. Lewis' decision to refuse to issue an occupancy permit. The Building Commissioner, Stamatakos, and Lt. Lewis wrote Goodyear on September 26, 1980 confirming their decision that "the building cannot be occupied until all Building Code Violations have been corrected including the installation of an automatic sprinkler system, which was supposed to be installed as of June 1980." Lt. Lewis informed the court that under Section 94 of the Village ordinances he had authority to reject a permit for using a building without a properly operating sprinkler system. Lt. Lewis' decision to reject a permit could only be overturned by the decision of an Appeals Board consisting of the Mayor, the Fire Chief, and the Building Commissioner. On September 24, 1980, Lewis' refusal to issue an occupancy permit for any use of the warehouse was sustained by two members of the Appeals Board, the Mayor and the Building Commissioner. At that point, Goodyear was barred from reopening or subletting the warehouse.

■ Western Assets' agreement with the Village did not fully satisfy its obligation to conform the building to Village ordinances; to the contrary it merely postponed its obligation to install the sprinkler system until June 6, 1980. When Western Assets failed to install the sprinkler system by June 6, 1980, it breached its agreement with the Village, violated section 94.14 of the Village ordinances, and failed to fulfill its obligation with Goodyear to "make all ... building changes or installations required to conform with applicable laws and ordinances." Furthermore, in not performing its obligation to modify the building, Western Assets prevented Goodyear from reoccupying the building and from subleasing the warehouse to Atlas Pallet as the Village officials properly refused to allow anyone to occupy the building until the sprinkler system was installed in compliance with the City Code. We hold that Western Assets breached the lease when it failed to install the sprinkler system before June 6, 1980 and deprived Goodyear of its rights to reoccupy or to sublet the warehouse.

■ Our next inquiry is whether Goodyear was entitled to vacate the premises after Western Assets breached its obligation to modify the building to conform with the building code. In *Hollywood Bldg. Corp. v. Greenview Amusement Co.*, 315 Ill.App. 658, 43 N.E.2d 566 (1940), the Illinois Appellate Court interpreted a lease in which the tenant was required "to comply with all health and police regulations to the extent of changes, structural or otherwise...." After the tenant signed the lease and occupied the leased premises, a theatre, the city widened the street in front of the theatre causing a canopy and sign attached to the building to extend into the street in violation of a city ordinance. The parties disagreed over which party was responsible for remodeling the canopy and sign to conform with the city ordinance. The court held that because the lease required the tenant "to comply with all health and police regulations to the extent of changes, structural or otherwise," the tenant's refusal to remodel the canopy and

sign was a default under the lease giving rise to the landlord's right to repossess the premises. *Id.* 43 N.E.2d at 567–68. *Cf. John Munic Meat Co. v. H. Gartenberg & Co.*, 51 Ill.App.3d 413, 9 Ill.Dec. 360, 366 N.E.2d 617 (1977) (landlord's failure to comply with lease provision obligating it to meet the requirements for retaining a government license necessary for tenant's business was a breach of the covenant of quiet enjoyment justifying the tenant's abandoning the premises); *American National Bank & Trust Co. of Chicago v. K–Mart Corp.*, 717 F.2d 394 (7th Cir.1983) (a tenant may abandon the leased premises if they become untenantable by reason of the landlord's breach of the covenant to repair. *Id.* at 398). Furthermore, paragraph 16(a) of the lease provides:

"If ... by reason of any law or ordinance, or by court decree, whether by consent or otherwise, the use of premises by Lessee for any of the specific *purposes* hereinbefore referred to shall be prohibited, Lessee shall have the right to terminate this lease upon written notice to Lessor...."

(Emphasis added). Since paragraph 16(a) uses the plural form of purpose, it is evident that the parties intended that this termination provision apply to more than one purpose or use and not be limited to Goodyear's single use of the leased premises as a tire center; rather, paragraph 16(a) grants Goodyear the right to terminate the lease if the various uses provided for in the lease were prohibited by law. On September 26, 1980, the Village informed Goodyear that "the building could not be occupied until all Building Code Violations had been corrected, including the installation of the automatic sprinkler system." We hold that as a matter of law, Goodyear was entitled to abandon and vacate the premises because they could no longer legally occupy the premises. Thus, Goodyear was deprived of all beneficial use of the leased premises by Western Assets' failure to honor its obligation to modify the building to conform with building ordinances by in-

stalling the sprinkler system and was legally justified in terminating its occupancy.

### B. *Goodyear's Liability for Damage to the Building.*

■ Because we hold that Goodyear was justified in terminating the lease, it is not liable for any damage to the building that occurred after September 30, 1980—the date of Goodyear's vacation of the premises and termination of the leased premises. We turn now to the question of liability for the damage that occurred before Goodyear terminated the lease—specifically, damages caused by the leaking roof and damages resulting from other causes, such as Goodyear's use, and the vandalism and neglect that occurred before the lease was terminated. The district court held that Goodyear was responsible for all damages occurring before Goodyear terminated the lease holding that the roof leak was caused by Goodyear's failure to clean the downspouts properly. Under the terms of the lease, Western Assets promised to "keep the exterior of the premises, including the foundations and roof, in good condition and repair...." Goodyear promised to "not commit any undue waste on the premises ... [and] at the termination of the lease, [to] surrender the premises to Western Assets in as substantially as good condition of repair as when received...." The word "repair" in a covenant to repair has been defined as "restoration after decay, waste, injury or partial destruction...." *Kaufman v. Shoe Corp. of America,* 24 Ill. App.2d 431, 164 N.E.2d 617 (1960). "[W]aste consists of the mere neglect or omission to do what will prevent injury, as to suffer a house to go to decay for want of repairs." *Consolidated Coal Co. v. Savitz,* 57 Ill.App. 659 (1894). At trial, the contractor who inspected and fixed the roof, Mr. Aiello, testified that the building had a "bowl roof with parapet walls" and was equipped with gutters, a drain, and downspouts that ran through the walls of the building. Aiello testified that he inspected the roof in either late 1979 or early 1980 at the request of the rental agent and found that leaves and wood debris had accumulated around the downspouts and prevented water from draining through them. Aiello explained that when water builds up on this type of roof, it seeps under the flashings. When the water freezes and thaws during the wintertime, the cycles of freezing and thawing buckle the flashings creating leaks.

■ The lease provided that Goodyear would not commit undue waste. Under Illinois law, waste means the failure to do what will prevent injury. *Consolidated Coal Co.,* 57 Ill.App. at 659. The failure to clean debris from the roof and gutters caused the damage to the roof and the consequent water damage to the building because the debris clogged the drains and prevented the water from properly draining from the roof through the gutter and downspout system. We hold that under Illinois law Goodyear committed waste when it failed to clean the roof of debris and to keep the gutters and downspouts clean and clear so that water could properly drain. We further hold that its failure to clear the downspouts was the source of injury to the premises because the clogged downspouts caused the flashings to buckle and the roof to leak. Accordingly, we affirm the district court's decision to hold Goodyear liable for the damage to the roof and the consequent water damage to the interior of the building.

We turn now to the final issue—whether the premises were additionally damaged by other causes such as Goodyear's use and occupancy of the warehouse or by vandalism and neglect before Goodyear terminated its lease. At trial, Lt. Lewis testified that he inspected the premises on June 5, 1980 in the company of George McCormick, the Goodyear real estate representative. The Village sent the rental agent an inspection report listing 35 code violations including exposed electrical wiring; damaged walls, ceiling and floor tiles; broken and boarded up windows; a damaged truck door and stairway; and the failure to install a sprinkler system. At trial, McCormick agreed that the inspection report "describe[d] the condition of the property on

June 5, 1980." The rental agent forwarded the inspection report to Mr. Aiello who inspected the warehouse less than a month later. Aiello testified, "the building was in pretty bad shape inside. It had been vandalized." When asked about the exposed electrical wire, Aiello stated that it "looked as if machinery had been pulled away or disconnected and the wiring left hanging and exposed." [2] Finally, Aiello testified that he did not repair the building in 1980 but did extensive work on the building in 1981 after Goodyear vacated the premises. During the defendant's case, Mr. Joe Kubik, a Goodyear employee, testified that when Goodyear vacated the premises in September of 1980, the building was in as good a condition as it was when Goodyear moved in. However, on cross-examination, Kubik stated that he failed to notice or observe exposed electrical wiring, damage to the overhead door, or broken windows. The district court found that "[t]he building ... was otherwise unattended and unoccupied, and during the winter, spring and summer of 1980, suffered damages as a result of vandalism and neglect ... [and was also] damaged by "Goodyear's use and occupation of the premises."

Our inquiry into whether the district court's finding that the building had suffered damage in addition to the water damage consists of two parts. First, whether the building was damaged before Goodyear terminated its lease. Secondly, whether the damage was caused by sources other than the leaking roof. Initially we turn to the two inspection reports filed by Lt. Lewis. After deleting items on the reports that cannot be characterized as damages, such as improper fuses, and items which reflect ordinary wear and tear, such as masonry work, we note that the inspection report submitted by Lt. Lewis after the June 5, 1980 inspection includes several items that

may be described as damage to the building, such as broken windows, doors, floor tiles and ceiling tiles.[3] These items did not appear in Lt. Lewis' February 14, 1977 inspection report issued when Goodyear initially occupied the warehouse. McCormick, the Goodyear real estate representative, confirmed that the inspection report accurately described the premises as of June 5, 1980. Aiello, who produced estimates submitted by subcontractors that bid on the repair work, testified that the building had been vandalized and "was in pretty bad shape." To contradict this proof that the building had been damaged during Goodyear's occupancy, the defendant produced the testimony of Joe Kubick, a Goodyear employee, who said that when Goodyear vacated the building at the end of September of 1980, the building was in as good a condition as when Goodyear moved in. Furthermore, the defendant impeached Aiello with a former statement made during a pretrial deposition in which Aiello said, "from the best I can remember, from the best I can understand your question, ... I am pretty sure at that time [summer of 1980] the only damage in the building was from the water and not from vandalism." After comparing the code violations listed by the fire inspector, a disinterested witness, in his February 14, 1977 report and the code violations listed in his June 5, 1980 report, we discovered that items that can be characterized as damages appeared on the June 5, 1980 report but did not appear on the February 14, 1977 report, thus leading to the conclusion that the building was damaged sometime between February 14, 1977 and June 5, 1980. We concur with the district court's finding that the building was damaged before Goodyear terminated its lease and turn now to the separate issue of whether the damage was

---

2. Aiello, who estimated the cost of correcting the various violations, did not obtain a separate estimate for correcting the exposed wiring. The electrician's estimate "to repair existing electrical wiring so as to correct code violations shown on inspection report ... and to repair existing light fixtures" was $6,300.

3. Several items on the June 5, 1980 inspection report are code violations such as improper fuses or masonary in need of repair and were not claimed as an element of damages. We emphasize that we are not considering these items when determining whether the building was damaged during Goodyear's occupancy.

caused by the leaking roof or by other causes.

 Aiello testified that he inspected the premises when he repaired the roof and noted that the floor tiles, ceiling, walls, insulation, and boiler room ceiling were damaged by water leaking through the roof. After deleting the water damage and the code violations that cannot be characterized as damage to the building, such as improper fuses and masonry work, the only items left on the June 5, 1980 inspection report are broken windows, exposed electrical wiring, and a damaged overhead door. Aiello testified that the overhead door required new channels and new tracks as a result of being broken into. Aiello affirmed at trial that the exposed electrical wiring "looked as if machinery had been pulled away or disconnected and the wiring left hanging and exposed." The defendant failed to present testimony to contradict Aiello's opinion that the wiring had been exposed because machinery had been pulled away or disconnected or that the overhead door had been damaged by persons breaking into the building. We conclude that the broken windows and door and the exposed wiring were not caused by the leaking roof but could have been caused by neglect on the part of Goodyear or by vandalism. Because the warehouse was damaged by vandalism or neglect during Goodyear's occupancy of the building, we concur with the district court's judgment that Goodyear is responsible for these damages.

The district court's judgment that Goodyear wrongfully terminated its lease and that Goodyear was responsible for damages to the building that occurred after October 1, 1980 is REVERSED. The decision of the district court that Goodyear is responsible for damage to the building occurring before October 1, 1980 is AFFIRMED. This case is REMANDED to the district court for a determination of the amount of damage done to the building before October 1, 1980. The cost of this action shall be borne by the plaintiff.