In re EVERGREEN VENTURES, a California limited partnership, Debtor.

John K. MICUDA and Marylouise Micuda, husband and wife, Plaintiffs,

v.

Ralph McDONALD, Chapter 7 Trustee, Defendant.

Ralph McDONALD, Chapter 7 Trustee, Counterclaimant,

v.

John K. MICUDA and Marylouise Micuda, husband and wife, Counterdefendants.

Bankruptcy No. B–89–11380–PHX–GBN. Adv. No. 91–343.

United States Bankruptcy Court, D. Arizona.

Nov. 24, 1992.

Paul Crane, and Marvin Johnson, Phoenix, Ariz., for plaintiffs/counterdefendants.

John J. Fries, James F. Wees, and Guy D. Kidd, Phoenix, Ariz., for the Fines.

Michael W. Carmel, Phoenix, Ariz., for defendant/counterclaimant.

## MEMORANDUM DECISION

DONALD MacDONALD IV, Bankruptcy Judge.

This case was tried in Phoenix in June. The record was left open for the submission of additional expert testimony. That testimony, along with extensive post-trial briefs, has been received by the court and the case is ready for decision.

John K. Micuda (Micuda), general partner of the Evergreen Ventures Limited Partnership (Evergreen), and his wife, Marylouise, filed a complaint in April of 1991 against Ralph McDonald, Evergreen's chapter 7 trustee, seeking a declaratory judgment for the amount of Micuda's liability under 11 U.S.C. § 723. Section 723(a) allows a bankruptcy trustee to proceed against the general partners of a partnership for the full amount of any "deficiency of property of the estate to pay in full all claims." McDonald has counterclaimed against the Micudas for the full amount of all unpaid claims and expenses, including a claim submitted by Jeffrey N. Fine and Mildred Fine, as trustees of the Mildred Fine Revocable Trust and successor to the Adolph Fine Revocable Trust (the Fines). Micuda has in turn objected to allowance of the Fine claim. The "amended and revised comprehensive proof of claim" of the Fines totaled $782,707.83. It has since been revised upward to in excess of $1.8 million. The thrust of the Fines' claim is Micuda's alleged waste to an apartment complex which they repossessed. The Fines also seek damages for conversion of certain property.

I find for the Fines on the proof of claim in the sum of $1,233,521.39 together with additional attorney's fees and costs. Consequently, liability of the Micudas to the trustee is fixed at the same sum.

*Jurisdiction*

This court has jurisdiction over this controversy primarily under 28 U.S.C. § 157(b)(2)(B) as the fundamental basis of the disputes revolve around the Fines' proof of claim. Jurisdiction is also established pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (F), and (O).

*Factual Background*

The Fines owned and operated the "Evergreen Terrace," a 182–unit, 35–building apartment complex in Tempe, Arizona, from 1977 to May 1983. Evergreen Ventures, a limited partnership with Micuda as general partner, purchased the complex in May of 1983 for $4.1 million. At the time of the purchase, most of the complex was about 20 years old. A portion known as the "College Court" was about 12 years old. The occupancy percentages were good and the property was well maintained. Evergreen paid $1 million down on the property with the balance financed by the Fines through a deed of trust. This instrument "wrapped" underlying encumbrances of $1.88 million.

After five years of relatively successful operation and roughly $478,975.00 in dividends to the Evergreen limited partners, occupancy declined substantially. Evergreen reduced its debt payments to the Fines in 1988. In early 1989, Evergreen made about $95,000.00 in repairs to the property, primarily for roofing. Per Micuda's request, roofing repairs were improperly made. New plywood decking was placed over old, rotten roofing, producing unstable roofs and short-lived repairs. These repairs were performed in anticipation of a workout with the Fines, but the parties never completed an agreement. Despite the limited repairs, general mainte-

nance of the facilities declined markedly. Micuda, desperately searching for a purchaser, "sold" the property to Veeravalli Krishnan in June of 1989. Mr. Krishnan placed nothing down on the property, controlled its cash flow, and allowed further deterioration of the failing project during his tenure. Micuda recovered the property from Krishnan in September and filed for chapter 11 relief in November of 1989.

Because of his concern over the condition of the property, Jeffrey Fine had the property inspected in late January and early February of 1990. The property was in very poor condition. Due to Micuda's inept management of the property, the Fines moved for appointment of a chapter 11 trustee. The United States Trustee supported appointment of a trustee. Ralph McDonald was appointed chapter 11 trustee in May of 1990. He controlled the property from May of 1990 through January 31, 1991. The bankruptcy case was converted to a chapter 7 on December 14, 1990. The Fines obtained relief from the automatic stay and held a foreclosure sale on January 31, 1991. At that time, they obtained possession of the property. Since then, the Fines have been restoring the project.

*Common Law Waste*

> Locating the line between what the possessory tenant could, and could not, reasonably do over the objection of his prospective successor in possession has been the chief task of the courts during the seven centuries of [waste] litigation since the 13th century.

5 Powell, *The Law of Real Property* ¶ 637, 56–6 (1992). The task faced here is a familiar one. A review of the law's development gives this case some perspective.

The rationale behind waste actions throughout the centuries lay in the need for the protection of succeeding estates against improper conduct by the person in possession. The Statute of Marlbridge, enacted in 1267, restricted the use of estates for years or for life for the protection of future owners of the land. The Statute of

Gloucester, enacted in 1278, provided for treble damages for waste. A third English statute on waste, the Statute of Westminster II, enacted in 1285, expanded remedies for waste to joint tenants and tenants in common. 5 Powell, *supra*, at 56–3–6.

■ Claims for waste have evolved far beyond the original English statutes and common law claims. No longer do courts require that a plaintiff in a waste action hold a future interest. Rather, the holder of a current interest, such as a vendor of real property, a lessor of real property, or a mortgagee, may maintain an action for waste. 5 Powell, *supra*, ¶ 644. For instance, in *Meyer v. Hansen*, 373 N.W.2d 392 (N.D.1985), a vendor on a contract for deed successfully initiated an action for waste against the purchaser of a hotel. In *Western Assets Corp. v. Goodyear*, 759 F.2d 595 (7th Cir.1985), a lessor was awarded damages for waste to premises leased by Goodyear. The Supreme Court recognized the right of a mortgagee to sue for waste in *Waterman v. MacKenzie*, 138 U.S. 252, 259, 11 S.Ct. 334, 336–37, 34 L.Ed. 923 (1891). "Even against a mortgagor in possession, the mortgagee may obtain an injunction or damages for such cutting of timber as tends to impair the value of the mortgage security...."

■ Waste is not strictly limited to real property. It can apply to items of personal property when such property is attached and intertwined with the real property premises. *Meyer v. Hansen*, 373 N.W.2d at 395.

Arizona law is the "applicable law" under 11 U.S.C. § 502(b)(1) for determination of the validity of the Fine claim. A.R.S. § 33–806 B provides:

> B. The trustee or beneficiary shall have a right to maintain an action against any person, including the trustor, for a claim for relief where damage or injury occurs or may occur to the trust property or interests therein, including but not limited to actions for damages or to prevent:

1. Physical abuse to or destruction of the trust property, or any portion thereof.

2. Waste.

3. Impairment of the security provided by the trust deed. In any such action the trustee or beneficiary, or both, shall also be entitled to recover costs and reasonable attorney's fees and shall be entitled to all remedies available. Recovery of damages under this section shall be limited to damages or injuries incurred during the time the trustor is in possession or control of the trust property. The provisions of § 33–814 shall in no manner restrict or limit the provisions of this section.

■ Thus, under Arizona law, a trust deed beneficiary, like a mortgagee, has an unequivocal statutory right to maintain an action for waste, physical abuse to or destruction of the trust property, or impairment of the security, *despite* the nonrecourse provisions of A.R.S. § 33–814.

Arizona's leading case on waste is *Jowdy v. Guerin*, 10 Ariz.App. 205, 457 P.2d 745 (1969). That case involved a waste claim arising out of a vendor/purchaser relationship. Jowdy was an assignee of the original purchaser; Guerin was the assignee of the original vendor. After Jowdy became the owner of a small home, he did not live in the home or maintain it. Someone destroyed the home. Jowdy argued that there was no evidence he actively wasted the property. The Arizona Court of Appeals found permissive waste. It stated:

Finding very little law in Arizona on the subject of waste, we are compelled to look elsewhere. The definition of waste as found in 56 Am.Jur., *Waste*, § 2, Page 450 (1947), reads as follows:

'Waste ... is a species of tort, which may be briefly and very generally defined as the destruction, misuse, alteration, or neglect of premises by one lawfully in possession thereof, to the prejudice of the estate or interest therein of another.'

And at § 4, Page 452:

'Waste is classified as voluntary or actual (sometimes called commissive), and permissive or negligent waste. Voluntary waste may be done by such acts as destroying, altering, or removing buildings, or cutting down timber trees. The failure of the tenant to exercise the ordinary care of a prudent man for the preservation and protection of the estate is permissive waste.'

Thus, three elements are essential to the cause of action:

1. There must be an act constituting waste.

2. The act must be done by one legally in possession.

3. The act must be to the prejudice of the estate or interest therein of another.

Applying this law, we first consider in connection with element No. 1 defendants' argument that the evidence is not legally sufficient to establish an act of waste on their part, and that the interest they have in the property does not subject them to liability. The facts are undisputed that the defendants completely divorced themselves from any concern over the property and did not make any plans for its protection. We believe this act clearly amounts to evidence upon which the trier of fact can find negligence required to constitute permissive waste since during the time of the waste defendants had the possessory rights to the property. Neglect by one lawfully in possession to the prejudice of the estate or interest of another in the property can be a basis for the action.

In *Graffell v. Honeysuckle*, 30 Wash.2d 390, 191 P.2d 858, 863 (1948), it was said "... Permissive waste implies negligence or omission to do that which will prevent injury, as, for instance, to suffer a house to go to decay for want of repair or to deteriorate from neglect." Although the evidence does not show the actual cause of the deterioration of the house, it does reflect that the defendants did not provide for its protection in any

manner whatever while in constructive possession and that they have failed to show that the deterioration was caused by anything other than their negligence. This we find is sufficient to support the trial court in its judgment.

*Jowdy*, 457 P.2d at 748.

■ Based upon the evidence developed at trial, the first two elements of permissive waste required by *Jowdy v. Guerin* have been established. There was an act constituting permissive waste: Evergreen failed to exercise ordinary care in the preservation of the complex. These omissions occurred while Evergreen was legally in possession of the premises. The P.B. Bell report, prepared soon after the bankruptcy filing, appropriately details the waste of the premises. This report has been well corroborated by representatives of Eagle Property Management, the United States Trustee, and other witnesses. Even Micuda admits the property was in poor condition.

The most conspicuous problems at the project, such as backed-up sewers, leaking roofs, and burned out units, were simply the tip of the iceberg. They were symptomatic of the neglect and deferred maintenance suffered throughout the project during Mr. Micuda's tenure. Ordinary repairs and maintenance had not been routinely undertaken. Roofs had not been adequately repaired. These leaking roofs caused interior damage throughout the ceilings, floors, and substrata, and exterior damage to the eaves, soffits, and fasciae. Backed-up sewers created other damage, such as ruined carpets and destroyed flooring and walls. There were broken windows, deteriorating swimming pools, burned-out units, landscaping problems, health and safety violations, and a host of other deficiencies. Micuda's maintenance budget had been about one-half of that paid by the Fines in real dollars, even including the $95,000.00 in repairs made by Micuda in early 1987. Micuda reduced the maintenance staff by 75 percent. He ran through a number of managers and spent very little time overseeing them or the project. His transfer of possession to Veeravalli Krishnan was the last straw. As in *Jowdy*, Micuda divorced himself from the property. He failed to do what a prudent owner would do: maintain the complex in a safe and reasonable condition. "Failure of such person [party in possession] to exercise the ordinary care of a prudent person for the preservation and protection of the estate is permissive waste." *Curtis v. Tromble*, 155 Ariz. 429, 430, 747 P.2d 590 (Ariz.App.1987). Micuda did not act prudently in preserving the Evergreen apartment complex.

Further, the evidence at trial established the deterioration of the project occurred while Evergreen Ventures, a limited partnership, acting through John Micuda, its general partner, was legally in possession of the premises. Thus, two of the essential elements of waste have been established by the plaintiffs.

*Damages*

■ Under *Jowdy*, the third element essential to a claim of waste is that the acts (or failure to act) must be to the prejudice of the estate or interest of another. Here, Micuda's omissions have been prejudicial to the interests of the beneficiary of the trust deed executed by Evergreen Ventures, the Fines. They sold a 182-unit project that was well managed and in good condition. They received a set of run-down units in very poor condition following Evergreen's ownership of the premises. The properties require extensive rehabilitation. Unquestionably, the Fines' interest in the property has been prejudiced by Evergreen.

■ The dollar amount of this "prejudice" for rehabilitation of the premises was the subject of an extensive amount of oral and documentary evidence from the Fines. I have summarized the restoration evidence in the following chart:

## RESTORATION ESTIMATES

| DATE | PARTY | AMOUNT | EXCLUSIONS* | PREPARED BY |
|---|---|---|---|---|
| 09/25/89 | John Micuda | $266,490 | CP,L,P,T | J. Micuda, General Partner |
| 10/24/89 | Rand Commercial Brokers | $600,000 | CP,L,T,S | R. Brock, Real Estate Broker |
| 02/28/90 | John Micuda | $150,000 | CP,L,P,T | J. Micuda, General Partner |
| 03/12/90 | P.B. Bell & Co. | $508,284 | AC,CL,CP,CT, DR,DW,L,WI, WH | R. Bureker, CPM |
| 03/30/90 | P.B. Bell & Co. | $300,000—$500,000 (or more) | AC,CL,CP,CT, DR,DW,L, WI,WH | R. Bureker, CPM |
| 06/90 | Eagle Property Mgmt. | $1,283,000 (full) $ 509,775 (partial) | L,T (full) (Unknown, partial) | Melanie Morrison, CPM |
| 07/25/90 | John Micuda | $490,000 | CP,S,T | J. Micuda, General Partner |
| 09/19/90 | Concord Companies, Inc. | $1,005,993 | DW,L,P,S,T | William Benedict, Contractor |
| 03/19/91 | Welbilt Construction Co., Inc. | $1,132,850 | AP,DW,P,T | Tom Nadler, Bob Hughes, Contractors |
| 06/92 | Jeffrey Fine | $1,231,000.00 | | Jeffrey Fine as Contractor |

### *EXCLUSION KEY:

AP Appliances
AC Air Conditioners
CL Cleaning
CP Carports
CT Kitchen Countertops
DR Drapes
DW Driveways, Parking Lots
L Landscaping, Grounds
P Pools
R Roofs
S Sewer Repairs
T Tree Removal
WI Windows
WH Water Heaters

---

The exclusions were not always clearly delineated. The primary estimates were for interior and exterior restoration of the property. None of the estimates included any allowance for asbestos removal.

Dennis Farr, an MAI who appraised the property, found the "stabilized" fair market value of the property to be $2.4 million as of June 1, 1990. According to Farr, if rehabilitation costs were $600,000.00, the property would be worth $3 million upon rehabilitation. Farr stated that if rehabilitation costs increased, the present value of the property would decrease proportionately. Thus, if repair costs were $1 million, the present value of the property would be $2 million. Based on his testimony, the value of the premises essentially mirrors rehabilitation costs.

Where damages to realty may be measured, either by the difference in the market value immediately before and immediately after injury, or by the cost of restoration, and the plaintiff gives evidence as to one, it is up to the defendant who has the burden of showing a reduction in damages, to show that the other measure of damages would be less. *Mikol v. Vlahopoulos*, 86 Ariz. 93, 340 P.2d 1000 (1959).

*Jowdy*, 457 P.2d at 750. Micuda failed to introduce any evidence that the loss of market value would be less than the cost of restoration. The only testimony on point indicates they are one and the same.

The task faced by the court turns on determining the amount of allowable restoration costs. A range of estimates has been presented, running from Micuda's February 28, 1990, $150,000.00 estimate to Eagle Property Management's $1,283,000.00 estimate.

Under Arizona law there is a distinction between the degree of proof necessary to establish the fact of damages and that necessary to fix the amount. Once the plaintiff has clearly established that he has suffered damages, his burden is relaxed and he need only show the amount with reasonable certainty, free from mere speculation or conjecture. *Gilmore v. Cohen*, 95 Ariz. 34, 386 P.2d 81, 11 A.L.R.3d 714 (1963); *Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 448 P.2d 866 (1968).

*Jowdy*, 457 P.2d at 749.

The plaintiffs (claimants) here have clearly established the fact of damages. After extensive review of the evidence, I find the cost of restoration to be $1,200,000.00. This is more than twice the amount estimated by John Micuda in July of 1990. Micuda has consistently underestimated the maintenance needs of the project from its inception. Four separate sources, Eagle Property Management, Concord Companies, Inc., Welbilt Construction Co., and Jeffrey Fine, have submitted restoration estimates in excess of $1,000,000.00. Both P.B. Bell and Rand Commercial Brokers, with estimates of $508,000.00 and $600,000.00 respectively, excluded substantial items of waste from their estimates and indicated their conclusions were tentative. I conclude that damages in the sum of $1.2 million have been established with reasonable certainty.

Jeffrey Fine also testified that another $100,000.00 to $300,000.00 may have to be spent for removal of asbestos insulation from the apartments. He indicated asbestos may have to be removed because water damage to roofs and ceilings has broken the barrier sealing asbestos insulation from the apartment occupants. I conclude that the Fines have not established damages for asbestos removal with reasonable certainty. Mr. Fine's estimates were not corroborated and appeared speculative.

*Defenses*

Micuda's primary defense is based on *In re Mills*, 841 F.2d 902 (9th Cir.1988). *Mills* was a California bankruptcy case. The issue was "whether a debtor's failure to make repairs on property subject to a purchase money lien gives the mortgagee a non-dischargeable claim for tortious waste under Cal.Civ.Code § 2929 (West 1974)." *In re Mills*, 841 F.2d at 903.

Mills purchased the Beverly Hotel for $900,000.00. He paid $100,000.00 down and gave the seller a wrap around deed of trust. Mills made three payments and retained possession of the premises for six months prior to the appointment of a receiver. The hotel, used primarily by low income transients in Los Angeles, was very run down following Mr. Mills' use. The seller held a trustee's sale and spent $125,000.00 rehabilitating the hotel. Poor sanitation and vermin infestations had rendered most of the rooms uninhabitable. Mills filed a chapter 7 bankruptcy after the trustee's sale. The seller brought an action under 11 U.S.C. § 523(a)(6) for nondischargeability on grounds of "bad faith" waste.

Applying the California case of *Cornelison v. Kornbluth*, 15 Cal.3d 590, 125 Cal. Rptr. 557, 542 P.2d 981 (1975), the Ninth Circuit concluded that there was insufficient evidence of "bad faith" waste and

reversed bankruptcy court and Bankruptcy Appellate Panel findings to the contrary.

[B]efore a finding of bad faith waste can be made, *Cornelison* requires a showing that defendant acted as a "reckless, intentional [or] malicious despoiler[ ] of property," rather than out of inability to make ends meet financially. 15 Cal.3d at 603–04, 125 Cal.Rptr. 557, 542 P.2d 981.

No such showing was made here. Mills made his mortgage payments for three of the six months the property was in his possession, and may have expended sums on maintenance as well. For the last three months, he diverted the income from the hotel to "other uses," FF No. 14, but there is no clear indication of what these other uses may have been. The only evidence on this point is Edwards' own testimony that Mills stopped making payments because "he was having money problems.... [H]e was involved with some properties, and needed a lot of money to deal with those properties, and that's why he had gotten behind." Reporter's Transcript at 76–77. This falls squarely within the category of waste due to financial difficulties, protected by the anti-deficiency statute.

*In re Mills*, 841 F.2d at 905.

There are a myriad of differences between *Mills* and the case at bar. First, California's waste statute does not include the broad Arizona language which renders anti-deficiency agreements inapplicable to waste claims. Cal.Civ.Code § 2929 (West 1974) provides: "No person whose interest is subject to the lien of a mortgage may do any acts which would substantially impair the mortgagee's security." In contrast, A.R.S. § 33–806 specifically allows a trustee or beneficiary the right to bring a waste claim against a trustor for physical abuse or destruction of the trust property, waste, or impairment of the security. It goes on to provide that the provisions of § 33–814, dealing with deficiencies, "shall in no manner restrict or limit the provisions of this

section." It is this basic broad exception to Arizona's deficiency statute that distinguishes the case at bar from *Mills*.

Secondly, even if the California statute were applied in Arizona, the facts here are substantially different. While cash flow from the project deteriorated, John Micuda retained a net worth in excess of $1.6 million. He had the ability, despite the project's economic difficulties, to reasonably maintain the project and chose not to do so. Moreover, during good times preceding the bankruptcy, Evergreen had taken $478,975.00 in dividends from the project.

Here, a strong case can be made for bad faith conduct on Micudas's behalf. Knowing that the property was in shambles following his failed transaction with Veeravalli Krishnan, Micuda failed to perform even minimal tasks for the maintenance of the premises. His failure to simply remove sewage from units and clean food from refrigerators resulted in substantial damages to the Fines. These rudimentary problems could have been remedied easily with a minimum of cost and effort by Micuda. His reckless failure to remedy these obvious deficiencies could be grounds for a finding of bad faith waste under the California statute.

■ It should also be noted that *Mills* was a dischargeability action under 11 U.S.C. § 523(a)(6). The concept of "willful and malicious injury" is not at issue here. Rather, this is fundamentally an objection to claim proceeding. It is not incumbent upon the Fines to prove anything other than permissive waste.

*Mills* simply does not aid Micuda. It is based upon California statutes dissimilar to the Arizona statutes applicable here. It is also based on *Cornelison v. Kornbluth*, a decision that has no counterpart in Arizona. While I question the wisdom of the Arizona legislature in adopting a statute that effectively nullifies the parties' nonrecourse agreement,[1] particularly in a multi-million

---

1. The nonrecourse provision of the deed of trust provided:

 5.16. *Nonrecourse.* Anything to the contrary herein notwithstanding, Trustor shall not be personally responsible or liable for any

amount (principal, interest, cost, expense or otherwise) due under this Deed of Trust or the Note, and the sole right and remedy of Beneficiary for nonpayment of any sum or nonperformance of any provision hereunder shall be

dollar commercial transaction, Micuda has been conspicuously silent by not attacking either A.R.S. § 33–806B or § 33–814 on constitutional or statutory construction grounds. Under these circumstances, I will follow the statute and allow a waste recovery.

■ The Micudas' second line of defense is the "depreciation" defense. Under this theory, "Mr. Fine himself is now doing repairs and replacements that were made necessary not by actionable waste or neglect, but by ordinary depreciation, reasonable wear and tear, and deferred maintenance during the bankruptcy case." (Micuda's closing brief of August 28, 1992, at 12.) According to Micuda, it is just as likely that the problems at Evergreen Terrace were caused by age and depreciation, as they were by his neglect. Therefore, where the damages might have resulted from one of several causes, no claim can be maintained. Micuda cites *Pena v. Stewart*, 78 Ariz. 272, 280, 278 P.2d 892 (1955), which in turn cites *Owl Drug Co. v. Crandall*, 52 Ariz. 322, 80 P.2d 952 (1938) and *Salt River Valley Water Users' Ass'n. v. Blake*, 53 Ariz. 498, 90 P.2d 1004 (1939).

In *Owl Drug Co. v. Crandall*, Martha Crandall fell off a stool at a lunch counter. Two employees came to help her up. They dropped her. During one of the two falls, Crandall broke her leg. There was no evidence as to which fall caused her broken leg. A jury verdict in favor of Ms. Crandall was reversed. Similarly, in the *Salt River Valley* case, the Association was charged with negligence for flooding a field, causing damage to a lettuce crop. The flooding was caused by weeds and debris blocking an irrigation ditch. There was no evidence of negligence by the Association in maintaining the ditch, which was regularly inspected. The Arizona Supreme Court reversed the trial court's verdict against the Association, stating that there was simply no proof that tied the Association to the flood.

Finally, in *Pena v. Stewart*, the plaintiffs failed to demonstrate the cause of a flash fire which injured the plaintiffs and killed their son. Because there were multiple possible causes for the fire, and no one cause had been shown by the plaintiffs, the Arizona Supreme Court did not allow the plaintiffs to recover.

The situation here is far removed from *Owl Drug, Salt River,* or *Pena.* There is no doubt as to the causation of the real and substantial damages suffered by the Fines. These damages were caused by Micuda's omissions. Unquestionably, Micuda did not maintain and had not maintained the project in an appropriate manner. It is negligent not to replace damaged roofs, sewers, windows, and doors. Such negligence leads to a host of related problems, including rotted wood, damaged walls and ceilings, and water damage. Micuda even admits the property was in poor condition and included $490,000.00 in restoration costs in his failed chapter 11 plan.

I agree that "mere" wear and depreciation may not constitute negligence in appropriate circumstances. There is a line that has been crossed here, however. When an older property is neglected, problems soon escalate out of control. "Mere wear and tear" proliferates into vast problems requiring hundreds of thousands of dollars to cure. The roof is an excellent example in this case. Mere depreciation under the blazing Arizona sun results in cracking, creating gaps around air conditioning units and other utility openings in the roofs. Routine roof maintenance will alleviate any problems. Micuda's haphazard maintenance and negligent repairs took a toll. Major work must still be done to repair the roofs, interior ceilings and walls, and eaves for "mere depreciation." Even when Micuda made roof repairs in 1988, he negligently ordered the contractor to place new roofing over rotted plywood. Such "repairs" are doomed to failure.

against the Trust Estate as provided herein, and Beneficiary shall not seek by complaint, judgment or otherwise to obtain or recover any deficiency or any other amount due hereunder from Trustor, and by accepting this

Deed of Trust and the Note, Beneficiary hereby waives all other rights and remedies.
The note issued in conjunction with the transaction contains virtually identical language.

■ Micuda's negligence transformed little problems into big problems. Wear and tear and depreciation, when left unchecked, accelerate and become waste. While natural depreciation is certainly a factor in the damages suffered here, when that depreciation can easily be avoided through proper maintenance, waste occurs.

Micuda also ignores the fact that this project has an estimated life of 45 years. While the bulk of the buildings were 28 years old in 1990, they were only in the middle of their life expectancy. They should not be fully depreciated, after 28 years of use, with proper maintenance. "Mere depreciation" does not lead to $1.2 million in restoration costs in the middle of a building's functional life.

I agree with Micuda that damages must be directly related to waste. I have based my calculation of damages primarily upon the P.B. Bell report and testimony of witnesses who viewed the premises during Micuda's possession. The P.B. Bell report was prepared during Mr. Micuda's tenure at the helm. There was no "failure of proof" for damages by the Fines, nor did the trustee cause the damages sought by the Fines.

■ The final defense poised by Micuda is for equitable estoppel. According to Micuda, the Fines, by failing to regularly inspect the property and by negotiating for a possible workout, are estopped from claiming waste.

> Equitable estoppel may be defined as the effect of the voluntary conduct of a party, whereby he is absolutely precluded from asserting rights which might have otherwise existed as against another person who, in good faith, has relied upon such conduct and has been led thereby to change his position for the worse. The essential elements of estoppel are that plaintiff, with knowledge of the facts, must have asserted a particular right inconsistent with that asserted in the instant action, to the prejudice of another who has relied upon his first conduct. If any of these essential elements are lacking, there is no estoppel. (Citations omitted.)

*City of Glendale v. Coquat,* 46 Ariz. 478, 481–82, 52 P.2d 1178 (1935).

I do not find the Fines' failure to inspect to be a course of conduct which caused detrimental reliance by Micuda. Nor do I find Mr. Fine's failed attempt to work out an agreement with Micuda to be inconsistent with the assertion of the Fines' rights to a waste claim. According to Micuda, Jeffrey Fine led him on regarding a possible settlement while Micuda spent approximately $95,000.00 in repairs. Jeffrey Fine's testimony and the documents executed in conjunction with the failed settlement negotiations indicate that the Fines at all times reserved their rights and that their acceptance of lesser payments was only a temporary indulgence that could be revoked at any time. While Mr. Fine certainly encouraged Micuda to repair the premises, this conduct is entirely consistent with his waste claim. The fact that settlement negotiations failed is meaningless. There is nothing inconsistent with Jeffrey Fine's conduct and his assertion for a waste claim. Micuda has no basis for an estoppel defense on the basis of such facts.

*Conversion and Other Damages*

John Micuda sold washing machines that were the subject of the Fines' security interest. They were worth about $6,400.00. He also converted, with the apparent aid of his accomplice Krishnan, two insurance checks totaling $27,121.39 for two burned-out units. His testimony to the contrary is not credible. The funds should have been paid to the Fines or to the holders of the underlying encumbrances. The Fines suffered losses of $33,521.39 as a result of Micuda's improper conversions of secured property.

■ The Fines also claim damages for lost rents in the sum of $10,360.00, arising from the two burned-out units, along with lost rents of $85,000.00 incurred during the restoration phase. I will not allow these damages. First, nothing in Arizona waste law allows such damages. Damages here are limited to the direct cost of restoration. Moreover, even if lost rents were allowable damages, the Fines have not demonstrated

any loss of their ability to lease units. In June of 1992, the property had only about 40 tenants. "Rent-ready" units were readily available but not being leased. Similarly, ready units were not being leased during the trustee's tenure, either. The market for these units has been poor. Consequently, the Fines have no claims for additional damages from Micuda for lost rents.

 The Fines requested prejudgment interest from January 30, 1990, forward. No post-conversion interest is allowable on the Fines' proof of claim. 11 U.S.C. § 502(b)(2). As no restoration expenses were actually incurred by the Fines prior to conversion of the case, an award of prejudgment interest would be inappropriate.

 The Fines seek an award of punitive damages against Micuda. While Micuda's omissions cannot be condoned, punitive damages are not justified on the facts of this case.

 Another issue arising out of the consolidated proceeding concerns the Fines' claim for reimbursement of costs and attorney's fees for prosecution of their motion to appoint a trustee in the chapter 11 phase of these proceedings. From my standpoint, appointment of a trustee was mandatory due to Micuda's neglect of the property. The Fines made a substantial contribution to the chapter 11 case in accordance with 11 U.S.C. § 503(b)(3)(D). *In re Catalina Spa and RV Resort, Ltd.*, 97 B.R. 13, 18–19 (Bankr.S.D.Cal.1989). While the Fines certainly benefitted from the trustee's appointment, the holder of the major underlying encumbrance of approximately $1.7 million, Pima Savings and Loan Association, also benefitted, along with tenants and trade creditors. No evidence substantiating fees of $15,291.50 for appointment of a trustee was submitted at trial, however. Therefore, I am forced to deny this portion of the Fines' claim.

I am making no determination with regard to the following components of the Fines' proof of claim:

| Description | Amount |
| --- | --- |
| Trade claims | $18,623.59 |
| Post-petition real estate taxes | $21,185.45 |
| Advances for health and safety concerns | $ 5,274.14 |
| Advances for trustee's attorney's fees | $13,118.00 |
| Costs incurred investigating $110,000 insider claim | $ 8,000.00 |
| Costs incurred investigating fire insurance proceeds diverted by Mr. Micuda | $ 4,000.00 |
| Post-petition real estate taxes unpaid by the debtor | $62,000.00 |
| Monies advanced by Fines to pay trustee's fees | $ 7,093.76 |

All of these items were either the subject of separate proceedings before Judge Nielsen or were waived by the Fines.

*Miscellaneous*

The trustee's counterclaim for a preference in the sum of $58,000.00 was dismissed with prejudice through stipulation of the parties during the trial. Also, through stipulation of the parties, all claims of John Micuda were withdrawn. Micuda will submit no claim in this proceeding whatsoever. Because of the withdrawal of his claims, the Trustee's request for equitable subordination and the Fines' objection to Micuda's claims are moot and therefore denied.

 John Micuda was acting for the benefit of the marital community of John and Marylouise Micuda from 1983 through 1991 when the acts of waste and conversion occurred. In accordance with A.R.S. § 25–215 D, judgment shall be entered jointly against the Micudas and the debt shall be satisfied first from their community property and second from the separate property of John Micuda.

The Fines submitted a number of alternative theories for allowance of their waste claim, including negligence, "statutory" waste, and contractual waste. In light of my findings regarding common law waste, these alternative theories are redundant and moot at this point. No additional relief is available to the Fines under these alternative theories.

## Conclusion

John Micuda, as general partner of the Evergreen Ventures Limited Partnership, was imprudent in his management of the Evergreen Terrace apartment complex. His failure to minimally maintain the project resulted in substantial damages to the Fines. Had the apartment project been in California, Micuda might have escaped liability. Under Arizona's unique statutes, however, Micuda cannot evade Fines' waste claim. Judgment shall be entered against John and Marylouise Micuda for the sum of $1,233,521.39. Separate orders and judgments will be issued consistent with this memorandum in both the adversary and administrative case files.